899 P.2d 576

Enrique **GONZALES** and Berlin Padilla, as Personal Representative of the Estate of Ricardo Garduno, deceased, Plaintiffs–Appellees, and Cross–Appellants,

v.

**SURGIDEV CORPORATION,** a corporation, Jock Morrison, M.D., and Holy Cross Hospital, Defendants–Appellants, and Cross–Appellees.

No. 21703.

Supreme Court of New Mexico.

May 25, 1995.

Oman, Gentry & Yntema, P.A., Nicholas G. Gentry, Albuquerque, for appellants.

Carolyn N. Merchant, Albuquerque, and Duhigg, Cronin & Spring, P.A., Frank L. Spring, and Helena Gorochow, Albuquerque, for appellees.

William H. Carpenter and David J. Stout, Albuquerque, for amicus curiae N.M. Trial Lawyers Ass'n.

## OPINION

FROST, Justice.

Defendant–Appellant Surgidev Corp. appeals from a judgment for compensatory and punitive damages entered against it in a products liability action. Plaintiffs–Appellees Enrique Gonzales and Ricardo Garduno sued Surgidev for personal injuries that resulted from implantation of intraoccular lenses manufactured by Surgidev. Surgidev appealed to the Court of Appeals, alleging five errors that mandate reversal: (1) Plaintiffs' state law claims were preempted by federal law, (2) the trial court erred in not including the Food and Drug Administration on the verdict form, (3) the trial court erred in admitting several pieces of evidence, (4) the trial court erred in submitting the issue of punitive damages to the jury, and (5) bailiff and jury misconduct warrant a new trial. Plaintiffs cross-appealed, alleging that the trial court abused its discretion in refusing to award Plaintiffs prejudgment interest. The Court of Appeals certified this case to us under N.M.S.A.1978, Section 34–5–14(C) (Repl.Pamp.1990), to consider whether federal preemption divests the state courts of subject matter jurisdiction in this case. We note jurisdiction to decide all the issues raised on appeal, *Collins ex rel. Collins v. Tabet*, 111 N.M. 391, 404 n. 10, 806 P.2d 40, 45 n. 10 (1991), and affirm the trial court on

each claim in both the appeal and cross-appeal.

## I. FACTS

In May 1985 Enrique Gonzales and Ricardo Garduno received treatment for cataracts from Dr. Jock Morrison in Taos. As part of the treatment, Dr. Morrison removed the natural lens from one eye of each patient and replaced it with an intraoccular lens manufactured by Surgidev. In 1985 an ophthalmologist could remove the natural lens and implant an intraoccular lens by one of two procedures, by intracapsular cataract extraction (ICCE) or by extracapsular cataract extraction (ECCE). The procedures differ in the method used for extracting the natural lens. The natural lens is surrounded by a capsule that helps the lens keep its shape. In the ICCE procedure, the lens capsule is entirely removed when the lens is extracted. In the ECCE procedure, the lens is extracted from inside the capsule but the rear wall of the capsule (the posterior capsule) is left in place to retain the natural barrier between the fluids in the rear of the eye and in the front of the eye.

In addition to the choice of implantation procedures, there were also two main categories of lenses an ophthalmologist could choose from, anterior chamber lenses, which are placed in front of the iris and pupil, and posterior chamber lenses, which are placed behind the iris and pupil in the space that the natural lens occupied before removal. The intraoccular lens that Dr. Morrison implanted in both patients was a Surgidev Style 10 intraoccular lens (Style 10), which was an anterior chamber lens. In addition, the Style 10 lens employed closed loops as mounts on either side of the lens that support the lens and hold it in place.[1] Dr. Morrison used the ICCE procedure to implant the Style 10 lens in both Gonzales and Garduno. As a result of complications both Gonzales and Garduno went blind in the eye containing the Style 10 implant. Dr. Morrison did not have either

Gonzales or Garduno sign an informed consent form before implantation.

The Food and Drug Administration (FDA) is responsible for regulating intraoccular lenses under the 1976 Medical Device Amendments to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 360c–k (1988). Under the regulatory scheme developed in the late–1970s, an intraoccular lens moves through three stages as it gains approval as being safe and effective. The first stage is called "core" status in which the implant is approved as an investigational device and may be sold for testing in humans on a limited basis. The manufacturer is required to conduct extensive monitoring of the core patients over the course of one year.

After the manufacturer has followed over 500 patients for one year without seeing significant adverse results, the implant may be upgraded to "adjunct" status. During the adjunct phase, the intraoccular lens is still considered investigational, but the manufacturer may distribute the lens for more widespread use. The reporting requirements are relaxed under adjunct status, but the manufacturer is still not allowed to claim that the lens is safe or effective. At all times during both the core and adjunct phase, the implanting doctor is required to get the patient's signature on an informed consent form which explains that the lens has not been approved and is still investigational. However, during the core and adjunct phases, the manufacturer is not required to place any labelling on the product's packaging.

If the investigations conducted under core and adjunct status demonstrate that the intraoccular lens is functional and safe, the manufacturer can apply for premarket approval from the FDA. Premarket approval means that the lens is no longer investigational and the manufacturer may advertise to the public that the lens is a safe and effective product and sell it without restrictions. In order to receive premarket approval, the manufacturer must submit its data from the core and adjunct monitoring to the Ophthal-

---

1. The Style 10 closed-loop lens consisted of a plastic convex lens with a square loop handle on either side which kept the lens centered in the eye. Several anterior chamber lenses utilized this design. An alternative lens design used side-

ways S-shaped or J-shaped mounts to hold the lens in place. These lenses were called open-loop lenses and both anterior and posterior chamber lenses employed this design before 1985.

mic Device Panel (Panel), a panel consisting mostly of ophthalmologists, which examines the data and gives its recommendation to the FDA. The manufacturer must also submit proposed labelling for the product for inclusion with the final approved product.

Surgidev began manufacturing the Style 10 lens in 1978 under core status. The lens was elevated to adjunct status in 1980. In 1981 and 1982, Surgidev submitted to the Panel its testing data for the Style 10 lens. The Panel subsequently recommended that the FDA grant the Style 10 premarket approval on condition that Surgidev include in its labelling notice of the differences between insertion of the Style 10 by the ICCE procedure and by the ECCE procedure. However, a manufacturer is not required to provide labelling for an intraoccular lens until the FDA has actually granted premarket approval for the lens. Despite several years of negotiations between the FDA and Surgidev, the FDA never gave the Style 10 premarket approval. Therefore, Surgidev was never required to label the Style 10. In 1986, in response to growing concerns in the medical community, the FDA demoted all closed-loop anterior chamber lenses. to core status, including the Style 10. Despite rapidly declining sales and mounting criticism, Surgidev continued to market the Style 10 under core status through 1987. The Style 10 lens was last sold in the United States in early 1988.

Gonzales and Garduno sued Surgidev, claiming that the Style 10 lens was defectively designed and that Surgidev had failed to adequately warn the medical community about dangers associated with implanting the Style 10 lens by the ICCE procedure. The jury returned a verdict for Gonzales and Garduno for compensatory damages of $434,-990.18 and $45,000 respectively and awarded them each $350,000 in punitive damages.

■ Surgidev appealed to the Court of Appeals on several grounds that are addressed below. As one of its numerous bases for appeal, Surgidev raised for the first time the question of federal preemption of state tort actions by the Medical Device Amendments, 21 U.S.C. § 360k. The Court of Appeals certified to this Court the question whether federal preemption is an issue of subject matter jurisdiction which may be raised for the first time on appeal. NMSA 1978, § 34–5–14(C)(2) (Repl.Pamp.1990) (certification of question of substantial public interest). Although only this question was certified for review, we have jurisdiction to review all the issues raised in this appeal and in Plaintiffs' cross-appeal. *Collins ex rel. Collins v. Tabet,* 111 N.M. 391, 404 n. 10, 806 P.2d 40, 45 n. 10 (1991).

## II. FEDERAL PREEMPTION

The first point we address is Surgidev's claim that Medical Device Amendments, 21 U.S.C. § 360k(a), expressly preempts all state tort claims based on defective-product liability, including those asserted by Gonzales and Garduno. However, Surgidev did not raise federal preemption during the trial and addressed this issue for the first time on appeal. Thus, before we examine the merits of this claim, we must first consider the threshold question whether this argument may be raised for the first time on appeal.

■ Surgidev argues that express federal preemption of a state claim deprives the state court of subject matter jurisdiction. It is well settled that subject matter jurisdiction cannot be waived and may be raised for the first time on appeal. *Chavez v. County of Valencia,* 86 N.M. 205, 209, 521 P.2d 1154, 1158 (1974); SCRA 1986, 1–012(H)(3) (Repl. Pamp.1992).

■ However, as we noted in *Sundance Mechanical & Utility Corp. v. Atlas,* 109 N.M. 683, 689, 789 P.2d 1250, 1256 (1990), a failure to state a cause of action in the complaint does not deprive the trial court of subject matter jurisdiction. Subject matter jurisdiction is the power to adjudicate the general questions involved in the claim and is not dependent upon the state of facts which may appear in a particular case, or the ultimate existence of a valid cause of action. *Mares v. Kool,* 51 N.M. 36, 41, 177 P.2d 532, 535 (1946). "The only relevant inquiry in determining whether the court has subject matter jurisdiction is to ask whether this kind of claim the plaintiff advances falls within the general scope of authority conferred upon such court by the constitution or stat-

ute." *Associates Inv. Co. v. Claeys*, 533 N.E.2d 1248, 1251 (Ind.Ct.App.1989).

In considering whether federal pre-emption affects subject matter jurisdiction, the issue is not whether Congress intended to replace state law with a federal regulatory scheme but "whether jurisdiction provided by state law is itself pre-empted by *federal* law vesting exclusive jurisdiction over that controversy in another body." *International Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 387–88, 106 S.Ct. 1904, 1910, 90 L.Ed.2d 389 (1986); *see also Sweeney v. Westvaco Co.*, 926 F.2d 29, 37–38 (1st Cir.) (discussing whether preemption under the Labor Management Relations Act divests courts of jurisdiction over collective bargaining agreements), *cert. denied*, 502 U.S. 899, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991); *Hughes v. Blue Cross of N. Cal.*, 215 Cal.App.3d 832, 263 Cal.Rptr. 850, 860–61 (1989) (discussing federal preemption under ERISA), *cert. dismissed*, 495 U.S. 944, 110 S.Ct. 2200, 109 L.Ed.2d 527 (1990). The *Davis* Court labelled this distinction choice-of-forum preemption, which deprives the state court of subject matter jurisdiction, as opposed to choice-of-law preemption, which limits the court's ability to grant relief on a state law claim. *Davis*, 476 U.S. at 391, 106 S.Ct. at 1912. Under choice-of-law preemption, a state court has jurisdiction to entertain the claim, but it must apply federal law in deciding the claim on the merits. In contrast, under choice-of-forum preemption, the state court lacks jurisdiction even to entertain the claim, which can then only be raised in federal court. The *Davis* Court noted that choice of forum preemption "does not apply to pre-emption claims generally but only to those preemption claims that go to the State's actual adjudicatory or regulatory power as opposed to the State's substantive laws." *Id.* at 391 n. 9, 106 S.Ct. at 1912 n. 9; *see also Gorman v. Life Ins. Co.*, 811 S.W.2d 542, 545 (Tex.) ("At the heart of the present dispute is whether, given the facts of this case, ERISA preemption implicates the subject-matter jurisdiction of the court or merely affects which law is to be used in the case."), *cert. denied*, 502 U.S. 824, 112 S.Ct. 88, 116 L.Ed.2d 60 (1991); *Van De Hey v. United States Nat'l Bank*, 90 Or.App. 258, 752 P.2d

848, 850 (1988) ("Unlike claims which are subject to the exclusive federal jurisdiction provision, common law claims are not taken outside the jurisdiction of state courts by virtue of federal preemption.").

Thus we must look to the statute to determine whether it displaces state courts as forums for considering claims involving medical devices. *See Davis*, 476 U.S. at 391 n. 9, 106 S.Ct. at 1912 n. 9 ("The nature of any specific pre-emption claim will depend on congressional intent in enacting the particular pre-empting statute."). 21 U.S.C. § 360k(a) provides in part:

[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

The corresponding FDA regulations provide in part:

[N]o State or political subdivision of a State may establish or continue in effect any requirement with respect to a medical device intended for human use having the force and effect of law (whether established by statute, ordinance, regulation, or court decision), which is different from, or in addition to any requirement applicable to such device under any provision of the act and which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under the act.

21 C.F.R. § 808.1(b) (1994).

An examination of the language of the statute and of the regulation demonstrates that any preemptive effect is not directed at displacing state courts as forums for adjudicating claims that implicate the Medical Device Amendments. Therefore, we conclude that Congress did not intend to deprive state courts of jurisdiction over claims involving intraoccular lens implants

when it promulgated the Medical Device Amendments. *See Davis,* 476 U.S. at 401–02, 106 S.Ct. at 1917–18 (Rehnquist, C.J., concurring) (noting that congressional intent to preempt state forum should be explicit); *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 741, 105 S.Ct. 2380, 2389–90, 85 L.Ed.2d 728 (1985) (noting presumption against preemption).[2] Accordingly, we hold that the trial court had proper subject matter jurisdiction over Gonzales's and Garduno's claims.

Surgidev argues, however, that in New Mexico, federal preemption always deprives a state court of subject matter jurisdiction. It points to *Ashlock v. Sunwest Bank of Roswell, N.A.,* 107 N.M. 100, 102, 753 P.2d 346, 348 (1988), in which this Court stated, "whether or not state law is preempted by federal legislation in a particular area is an issue directed toward subject-matter jurisdiction." This sweeping statement linking subject matter jurisdiction to federal preemption, however, goes against the weight of authority from other jurisdictions and does not comport with our discussions of subject matter jurisdiction in *Sundance Mechanical,* 109 N.M. at 689, 789 P.2d at 1256, and *Mares v. Kool,* 51 N.M. at 41, 177 P.2d at 535, discussed above. Accordingly, to the extent it conflicts with this opinion, *Ashlock* is overruled.

In addition to its choice-of-forum preemption argument, Surgidev argues that 21 U.S.C. § 360k(a) preempts Plaintiffs' state law claims. Plaintiffs counter that federal preemption of state law is an affirmative defense that must be raised before the end of trial or it is waived. *See Xorbox v. Naturita Supply Co.,* 101 N.M. 337, 339, 681 P.2d 1114, 1116 (1984) ("[I]t is well settled that an affir-

mative defense not pleaded or otherwise properly raised is waived."); SCRA 1986, 1-008(C) (Repl.Pamp.1992). Although SCRA 1–008(C) does not include federal preemption in its nonexhaustive list of affirmative defenses, other jurisdictions have held that it is a claim of avoidance under a similar rule of civil procedure. *See Dueringer v. General Am. Life Ins. Co.,* 842 F.2d 127, 130 (5th Cir.1988) ("[P]reemption in this case clearly involves a choice-of-law question and therefore must be asserted as an affirmative defense."); *Gilchrist v. Jim Slemons Imports, Inc.,* 803 F.2d 1488, 1497 (9th Cir.1986) ("[Defendant's] preemption argument therefore implicates only a choice-of-law question that is waived unless it is timely raised."); *Gorman,* 811 S.W.2d at 546 (noting that choice-of-law preemption is an avoidance that must be pleaded or is waived); *Martin v. Eastern Airlines, Inc.,* 630 So.2d 1206, 1208 (Fla.Dist.Ct.App.1994) (preemption is affirmative defense of avoidance). We agree that federal preemption is an avoidance of an otherwise valid state law claim and must be pleaded or is waived. *See Beyale v. Arizona Pub. Serv. Co.,* 105 N.M. 112, 114, 729 P.2d 1366, 1368 (Ct.App.) ("An affirmative defense ordinarily refers to a state of facts provable by defendant that will bar plaintiff's recovery once a right to recover is established."), *cert. quashed,* 105 N.M. 111, 729 P.2d 1365 (1986). Accordingly, because Surgidev did not properly raise federal preemption at trial, we conclude that it waived that defense. Therefore, we need not consider the merits of the choice-of-law preemption claim on appeal. *Fredenburgh v. Allied Van Lines, Inc.,* 79 N.M. 593, 595, 446 P.2d 868, 870 (1968) ("If an affirmative defense is not pleaded or otherwise properly raised, it is waived.").

---

2. We note that this conclusion is implicitly supported by several federal cases which have examined the more limited issue of choice-of-law preemption under the Medical Device Amendments, 21 U.S.C. § 360k(a). In *Michael v. Shiley, Inc.,* 46 F.3d 1316, (3d Cir.1995), *Gile v. Optical Radiation Corp.,* 22 F.3d 540 (3d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994), and *Stamps v. Collagen,* 984 F.2d 1416 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993), the plaintiffs' claims were brought in state court and subsequently removed to federal court where the court

considered the defendants' choice-of-law preemption claims on the merits. However, federal removal jurisdiction is derivative. If the state court lacks subject matter jurisdiction, then the federal court cannot acquire jurisdiction upon removal. *Lambert Co. v. Baltimore & Ohio R.R.,* 258 U.S. 377, 382, 42 S.Ct. 349, 351, 66 L.Ed. 671 (1922). By ruling on the merits of the defendants' choice-of-law preemption claims, the circuit courts implicitly confirmed that any preemption under § 360k(a) is limited to displacement of state law and does not extend to state court jurisdiction.

## III. FAILURE TO PLACE THE FDA ON THE VERDICT FORM

Surgidev next argues that the trial court committed reversible error by not placing the FDA on the verdict form in order to allow the jury to apportion liability for Plaintiffs' injuries. Surgidev admits that it did not raise the issue of the FDA's negligence in the pleadings. It argues, however, that the issue was tried implicitly and therefore should have gone to the jury. This Court noted in *Page & Wirtz Construction Co. v. Solomon,* 110 N.M. 206, 208–09, 794 P.2d 349, 351–52 (1990), that "when issues not raised by the pleadings are tried by the express or implied consent of the parties, they are treated in all respects as if they had been raised in the pleadings."

 Surgidev points out that Plaintiffs' expert witness, Dr. Drews, testified that the Panel should not have recommended approval of the Style 10 lens. Surgidev also notes that the evidence demonstrated that the government had control over how the lens could be distributed. However, the evidence that Surgidev relies on was also relevant to whether the lens was actually defective and whether Surgidev had any notice of defects. Dr. Drews' testimony tended to show that the Style 10 lens was defective despite the fact that the Panel recommended approval and that the data Surgidev submitted to the Panel demonstrated this defect. In addition, the evidence Surgidev points to regarding governmental control over the release of information was relevant to the issue whether Surgidev could have warned of any defects.

As the Court of Appeals noted in *Rice v. Gideon,* 86 N.M. 560, 561, 525 P.2d 920, 921 (Ct.App.1974), *cert. denied,* 87 N.M. 299, 532 P.2d 888 (1975), "consent [to an unpleaded issue] cannot be implied where the evidence introduced is relevant to some other issue and the parties do not squarely recognize it as an issue in the trial." The evidence identified by Surgidev was relevant to Plaintiffs' claims of product defect and failure to warn. Accordingly, we find that the trial court did not abuse its discretion by ruling that the issue of FDA negligence was not implicitly raised and by refusing to submit the issue of FDA negligence to the jury.

## IV. EVIDENTIARY RULINGS

Surgidev next argues that various evidentiary rulings by the trial court were improper and mandate reversal. We note at the outset that the trial court has "a great deal of discretion in admitting or excluding evidence, and we will reverse the trial court only when it is clear that the court has abused its discretion." *Behrmann v. Phototron Corp.,* 110 N.M. 323, 327, 795 P.2d 1015, 1019 (1990).

### A. Relevance of Post-incident Publications.

 First, Surgidev contends that articles published after Gonzales's and Garduno's lens implants in May 1985 were improperly admitted to prove that Surgidev knew of the lens defects before Plaintiffs' surgeries. However, as the trial court correctly noted, although this evidence could not be used to show that Surgidev knew of the lens defects, it was relevant to Surgidev's mental state for purposes of awarding punitive damages. *See Clay v. Ferrellgas, Inc.,* 118 N.M. 266, 272 n. 4, 881 P.2d 11, 17 n. 4 (1994) (admitting evidence not related to underlying claim but relevant to mental state for punitive damages), *cert. denied,* —— U.S. ——, 115 S.Ct. 1102, 130 L.Ed.2d 1069 (1995). The same is true for evidence that the FDA returned the Style 10 to core status in 1986. All of this evidence pertained to information available before 1988 when Surgidev last marketed the Style 10 lens. Thus, it was properly admitted to demonstrate Surgidev's mental state in continuing to market the Style 10 lens in light of mounting information showing problems with the Style 10 lens.

### B. FDA Transcripts Admissible as Public Records.

Next, Surgidev argues that the transcripts of the Panel hearings are hearsay and that the trial court abused its discretion by admitting them into evidence as public records. The public records exception to the hearsay rule, SCRA 1986, 11–803(H)(3) (Repl. Pamp.1994), provides for the admission of "[r]ecords, reports, statements or data compilations, in any form, of public offices or

142

agencies, setting forth … factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." *Id.* Surgidev contends that the transcripts are not factual findings under SCRA 11–803(H)(3) because they contain opinions of the Panel members.

The U.S. Supreme Court addressed this issue under the federal equivalent to SCRA 11–803(H)(3) in *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988). In *Beech Aircraft* the Court considered the admissibility of an investigatory report on the cause of an airline crash. *Id.* at 157–59, 109 S.Ct. at 443–45. The Court held "that portions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion. As long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report." *Id.* at 170, 109 S.Ct. at 450; *see also Clark v. Clabaugh,* 20 F.3d 1290, 1294 (3d Cir.1994), ("[T]he [official report], which was authored by officers charged with a legal duty and authorized to conduct the investigation, is presumed admissible under Rule 803(8)(C), including its opinions, conclusions and recommendations, unless the defendants demonstrate its untrustworthiness."); *Anaya v. New Mexico State Personnel Bd.,* 107 N.M. 622, 627, 762 P.2d 909, 914 (Ct.App.) (noting that "findings" included conclusions and opinions of the factfinder), *cert. denied,* 107 N.M. 673, 763 P.2d 689 (1988). The *Beech Aircraft* Court noted:

> Rather than requiring that we draw some inevitably arbitrary line between the various shades of fact/opinion that invariably will be present in investigatory reports, we believe the Rule instructs us—as its plain language states—to admit "reports … setting forth … factual findings." The Rule's limitations and safeguards lie elsewhere: First, the requirement that reports contain factual findings bars the admission of statements not based on factual investigation. Second, the trustworthiness provision requires the court to make a determi-

nation as to whether the report, or any portion thereof, is sufficiently trustworthy to be admitted.

*Beech Aircraft,* 488 U.S. at 169, 109 S.Ct. at 449–50. The Court pointed out four factors that help determine trustworthiness in a report: (1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation. *Id.* at 167 n. 11, 109 S.Ct. at 449 n. 11.

In addition, the court in *Kehm v. Procter & Gamble Manufacturing Co.,* 724 F.2d 613, 618 (8th Cir.1983), noted that the burden of proving untrustworthiness is on the party opposing admission of the report. The *Kehm* court pointed out:

> The public records and reports exception rests on "the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." The rule "assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present." The burden is on the party opposing admission to prove the report's untrustworthiness.

*Id.* (citations omitted) (allowing admission of Center for Disease Control evaluation of toxic shock syndrome based on doctor and patient questionnaires); *cf. Baker v. Firestone Tire & Rubber Co.,* 793 F.2d 1196 (11th Cir.1986) (finding subjective, politically-motivated congressional committee report inadmissible).

In the present case the Panel was under a duty to hold hearings and make findings concerning the safety and efficacy of the Style 10 lens. Thus the Panel transcripts are presumed trustworthy. Surgidev, however, has not made any showing under the factors described in *Beech Aircraft* that would overcome this presumption. The Panel hearings were timely, occurring as early as 1982, before large-scale use of the Style 10 lens. The Panel was composed of expert ophthalmologists who were very familiar with the technology and surgical methods involved. Indeed, Surgidev went to great

lengths to tout the Panel's expertise. Surgidev also acknowledged that its representatives were present at the hearings regarding the Style 10 and therefore could have alerted the Panel to any inaccuracies. Finally, Surgidev offers no evidence of any bias by the Panel indicating untrustworthiness. In fact, Surgidev provided all of the evidence the Panel relied on and argued strenuously that the Panel's ultimate recommendation that the FDA give the Style 10 premarket approval was scientifically sound. Surgidev's only claim for excluding the hearing transcripts is that they contain opinions. However, as discussed above, the mere fact that the transcripts contain opinions of the Panel does not render them inadmissible.

Of course, Surgidev could have attempted to identify and exclude specific portions of the hearing transcripts that may have been less trustworthy or irrelevant. *Beech Aircraft*, 488 U.S. at 169, 109 S.Ct. at 449–50. Instead, Surgidev opted to introduce the full set of transcripts from all the Panel hearings once the trial court held that they fell within the public records exception to the prohibition against hearsay. Accordingly, we find that the trial court did not abuse its discretion by admitting the Panel hearing transcripts into evidence as public records.

## C. Page From Federal District Court Case Is Hearsay.

Surgidev's third contention is that the trial court improperly admitted into evidence a page of a published opinion from a different case involving Surgidev, *Surgidev Corp. v. Eye Technology, Inc.*, 648 F.Supp. 661, 674 (D.Minn.1986). *Eye Technology* involved a dispute between Surgidev and a former sales manager who switched companies. At issue in the case before us is a statement taken from the facts of the *Eye Technology* opinion and attributed to Dennis Grendahl, President of Surgidev. Grendahl is reported in *Eye Technology* to have said, "Fitz, you've got a hundred thousand [Style 10] lenses on the shelf. Go sell them." Surgidev argues that both Grendahl's statement and the page from the *Eye Technology* case in which it is found are hearsay.

The statement itself is not hearsay because it is an admission by a party-opponent, SCRA 1986, 11–801(D)(2)(d) (Repl. Pamp.1994), and it is relevant to the issue of punitive damages to show that Surgidev aggressively pushed the lens despite knowing of the dangers. However, the page of the opinion containing the statement is hearsay. It is hearsay because Plaintiffs are offering the federal district court's account of what Grendahl said as proof that Grendahl made that statement. *See* SCRA 1986, 11–801(C) (Repl.Pamp.1994). Plaintiffs attempt to avoid this hearsay problem by suggesting that the trial court took judicial notice of the page in question. It is unclear on what basis the trial court relied in admitting the page into evidence. However, a page from a published opinion is not a proper subject for judicial notice nor does it fall within a hearsay exception.

An excerpted page of facts from a district court opinion is, at best, somewhat analogous to a trial court's findings of facts. Such findings are not the proper subject for taking judicial notice. In *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994), the court outlined the limitations on using judicial notice for court orders.

[A] "court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" Accordingly, a court may take notice of another court's order only for the limited purpose of recognizing the "judicial act" that the order represents or the subject matter of the litigation.

*Id.* (citation omitted) (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir.1992)); *see also M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir.1983) ("As a general rule, a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it.").

The *Jones* court went on to examine whether judicial findings fell within the public records exception to the hearsay rule dis-

cussed above. It concluded that "judicial findings of fact in a court's order in a previous case are not admissible in another case under Rule 803(8)(C)." *Jones*, 29 F.3d at 1554. The court reasoned that the drafters intended Rule 803(8)(C) to apply to findings of agencies and offices of the executive branch, not to judicial findings. *Id.; see also Nipper v. Snipes*, 7 F.3d 415, 417–18 (4th Cir.1993) (holding that judicial findings are hearsay not admissible under Rule 803(8)(C)).

■ We agree with the federal courts and hold that the trial court abused its discretion in admitting the page from the *Eye Technology* case into evidence. However, the error was harmless. Although the facts from the *Eye Technology* opinion could not be introduced as evidence, they could properly serve as a basis for deposing Grendahl on those matters. In response · to Plaintiffs' questions at his deposition, Grendahl discussed the matters in the page from the *Eye Technology* opinion regarding the declining sales of the Style 10 and the departure of Mr. Fitzsimmons from Surgidev. When asked if he ever said: "Fitz, you've got a hundred thousand [Style 10] lenses on the shelf. Go sell them," Grendahl gave an equivocal response. He acknowledged that he may have made the statement and then went on to explain the surrounding circumstances in an attempt to diffuse any negative implications arising from such a statement. Given his response, it was within the jury's province to weigh Grendahl's equivocation and evaluate whether he did in fact make the statement at issue. *Cf. Franklin v. Duckworth*, 530 F.Supp. 1315, 1319–20 (N.D.Ind. 1982) (equivocal response treated as tacit admission for hearsay purposes), *aff'd*, 714 F.2d 148 (7th Cir.1983). Accordingly, because the facts contained in the page from the *Eye Technology* case were already properly before the jury prior to the introduction of the page itself, admission of the page into evidence was harmless error.

D. Relevance of Testimony Regarding the Style 8 and Style 63 Lenses.

Surgidev's final evidentiary contention is that the trial court erred in allowing testimony regarding the Surgidev Style 8 and Style 63 lenses. Surgidev argues that evidence of earlier defects in the Style 8 and Style 63 lenses is not relevant to whether Surgidev had notice of potential defects in the Style 10 lens because the Style 8 and Style 63 lenses utilized different designs than the Style 10 lens.

■ We agree that evidence of a defect in one product model is not relevant to prove notice of a defect in another model, unless the models are substantially similar. *Lewy v. Remington Arms Co.*, 836 F.2d 1104, 1109 (8th Cir.1988). However, the evidence concerning the other defective lenses was not admitted to prove notice. Instead, the testimony regarding the earlier models demonstrated prior instances of Surgidev's failure to promptly remove defective lenses from the market after learning of the defects. Such prior acts are relevant to the issue of punitive damages because they demonstrate a reckless disregard for the safety of others. *Edgar v. Fred Jones Lincoln Mercury, Inc.*, 524 F.2d 162, 167 (10th Cir.1975). As the Tenth Circuit noted in *Edgar*, "when evil intent, actual or presumed, is a material element or issue in a case, similar prior acts may, with judicial approval, be admitted in evidence to establish such intent." *Id.* at 167 n. 3 (discussing punitive damages); *see also Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364 (10th Cir.1987) (admitting prior acts to show recklessness and outrageous conduct); *Silkwood v. Kerr–McGee Corp.*, 769 F.2d 1451, 1458 (10th Cir.1985) (noting that under Oklahoma law prior acts are admissible to determine punitive damages), *cert. denied*, 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 356 (1986); *Stockett v. Tolin*, 791 F.Supp. 1536, 1558 (S.D.Fla.1992) ("In considering the nature, extent, and enormity of the wrong and all of the surrounding circumstances, courts have regularly considered acts other than the acts giving rise to the defendant's liability to the plaintiff on the issue of punitive damages."). Accordingly, we find that the trial court did not abuse its discretion by admitting the evidence pertaining to the Style 8 and Style 63 lenses.

## V. SUFFICIENCY OF EVIDENCE FOR PUNITIVE DAMAGES

■ Surgidev's next argument is that the trial court abused its discretion by submitting the issue of punitive damages to the jury because the evidence was insufficient as a matter of law to support an award of punitive damages. This claim is more properly characterized as an argument that a motion for a directed verdict on punitive damages should have been granted. *C.E. Alexander & Sons, Inc. v. DEC Int'l, Inc.,* 112 N.M. 89, 96, 811 P.2d 899, 906 (1991). We note that on appeal we will not reweigh the evidence. We only examine whether substantial evidence supports the denial of a directed verdict after viewing the facts and all reasonable inferences in the light most favorable to the party resisting the motion. *Id.; Bourgeous v. Horizon Healthcare Corp.,* 117 N.M. 434, 437, 872 P.2d 852, 855 (1994).

We noted in *Clay v. Ferrellgas, Inc.,* 118 N.M. 266, 269, 881 P.2d 11, 14 (1994), "To be liable for punitive damages, a wrongdoer must have some culpable mental state, and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level." *See also Northrip v. Conner,* 107 N.M. 139, 142, 754 P.2d 516, 519 (1988). In the context of a punitive damages claim, " 'reckless' is defined as 'the intentional doing of an act with utter indifference to the consequences.' " *Ferrellgas,* 118 N.M. at 269, 881 P.2d at 14 (quoting SCRA 1986, 13–1827 (Repl.Pamp.1991)).

■ At issue here is whether Surgidev acted recklessly by failing to issue a warning regarding the implantation of the Style 10 using the ICCE procedure. Viewing the evidence in the light most favorable to Plaintiffs, we find that there is substantial evidence supporting the trial court's refusal to direct a verdict on the issue of punitive damages.

At the outset, we note that all of the relevant data indicating significant long-term problems with the Style 10 was known by Surgidev as early as 1982. In fact, Surgidev compiled this data as required by the FDA. Surgidev's 1982 data indicated that 20 percent of the patients implanted with the Style 10 using the ICCE procedure ended up with low visual acuity (worse than 20/40 vision). This percentage was twice as bad as the percentage of low visual acuity experienced by patients implanted with the Style 10 using the ECCE procedure. This percentage was also five to seven percentage points worse than the rate of low visual acuity experienced by patients implanted with other anterior chamber lenses using the ICCE procedure.

Surgidev's 1982 data also indicated that implanting the Style 10 using the ICCE procedure resulted in much higher rates of sight threatening complications. Over 10 percent of patients with a Style 10 lens implanted using the ICCE procedure experienced secondary glaucoma.[3] This figure was six times the rate of secondary glaucoma for the ECCE procedure and was well beyond the FDA's grid for acceptable complications rates. Furthermore, 10.2 percent of patients experienced macular edema[4] with the ICCE procedure, over twice the rate for the ECCE procedure and also well beyond FDA acceptable rates. The Panel also noted that there were statistically significant differences in the incidence of iritis[5] between the ICCE group and ECCE group of patients. In addition, experts testified that in 1983 the FDA revised its grid for acceptable rates of complications, which put Surgidev's data even further beyond the FDA's allowable norms.

Furthermore, Surgidev was aware that its figures probably underestimated the percentage of complications in patients. In 1982 the Panel noted that Surgidev had a significantly lower response rate from the implanting doctors than the other lens implant companies, with only a 62 percent patient follow-up rate. In addition, one of Surgidev's representatives at the Panel hearing acknowledged that doc-

---

3. Secondary glaucoma is increased pressure inside the eye that results from scarring and which leads to loss of vision.

4. Macular edema is the accumulation of fluid in the macula, the center of the retina where most fine vision takes place. A macular edema can result in a blind spot in the center of the field of vision.

5. Iritis is an inflammation of the iris.

tors tended to underreport the number of complications on the follow-up reports that they did send in.

· Additionally, Plaintiffs' expert, Dr. Drews, testified that the ICCE data showed that the Style 10 caused UGH syndrome[6] in some patients within one year of implantation, which was how long Surgidev monitored patients for complications. Drews also testified that when UGH syndrome appears in some patients within one year, the actual number of patients who will eventually experience it rises dramatically because the syndrome usually takes time to develop. Finally, Drews testified that Surgidev was aware of the likelihood of increasing incidences of UGH syndrome because the company had experienced similar problems involving UGH syndrome with earlier lens styles.

Drews also testified that Surgidev failed to adequately follow up on long-term monitoring of sight threatening complications. In addition, Surgidev appointed the creator of the Style 10 as its medical monitor for the lens, even though he received royalties for each lens sold and was paid to actively promote the lens to hospitals across the nation. The medical monitor is responsible for the continued monitoring and evaluation of the data concerning the safety and effectiveness of the lens. 21 C.F.R. § 813.46(a) (1994). Surgidev's medical monitor for the Style 10, however, never submitted any monitoring reports to Surgidev or to the FDA. Thus Surgidev failed to keep adequately informed of the data that would have indicated potential problems.

Surgidev strenuously argues that it could not have known that there was any problem with the lens given that the Panel voted unanimously to recommend approval for the Style 10 lens. However, Surgidev's argument fails to acknowledge the differences between the complication rates for the Style 10 used with the ICCE procedure versus the ECCE procedure. Drews testified that, of all the intraoccular lenses, the Style 10 was unique because its ICCE data showed a significantly higher complication rate than its

ECCE data. The Panel noted that the differences in complications between the ICCE and ECCE procedures for the Style 10 lens were larger than those for other brands of intraoccular lenses, and it expressed strong concern over those differences. Although the ICCE data was well outside the FDA grid, the Panel noted that the ECCE data for the Style 10 was acceptable, and, according to Drews, the Panel was "leaning over backwards" to be fair to Surgidev by not rejecting the lens altogether. However, as a condition of its recommendation to the FDA for premarket approval, the Panel required that Surgidev include a warning on its label highlighting the differences between the risks associated with the ICCE and the ECCE procedures. According to Drews, the Panel had never previously required such a warning for an intraoccular lens. Labelling, however, is only required by the FDA once the lens actually receives premarket approval. From 1983 to 1986, the period when Surgidev actively pursued premarket approval and submitted proposed labelling for the Style 10 to the FDA, Surgidev made no effort to warn ophthalmologists of the risks identified by the Panel and specifically required in the future labelling. After the lens was returned to core status in 1986, Surgidev abandoned its proposed labelling efforts without ever having warned the medical community of the risks identified by the Panel in 1982.

Drews testified that, according to the data Surgidev had in 1982, the Style 10 was unreasonably dangerous with the ICCE procedure, that only Surgidev had access to that data, and that Surgidev's failure to give any warning of the potential problems with the ICCE procedure was a betrayal of the medical community. He testified that if doctors had been aware of Surgidev's data on the ICCE procedure, they would have found those risks to be unacceptable for implantation of the Style 10 by the ICCE procedure.

In addition, Plaintiffs demonstrated that independent studies conducted between 1985 and 1987 confirmed the problems of the Style

---

**6.** "UGH" is an acronym for uveitis, glaucoma, and hyphemia. Uveitis is an inflammation inside the eye, and hyphemia is internal bleeding in the eye. UGH syndrome is the occurrence of at least two of these three sight threatening conditions.

10. Yet, Surgidev continued promoting the use of its lens in conjunction with the ICCE procedure after 1987 without giving any warnings to the medical community.

In *Ferrellgas*, 118 N.M. at 269, 881 P.2d at 14, we held:

> [A]s the risk of danger increases, conduct that amounts to a breach of duty is more likely to demonstrate a culpable mental state. The circumstances define the conduct; a cavalier attitude toward the lawful management of a dangerous product may raise the wrongdoer's level of conduct to recklessness, whereas a cavalier attitude toward the lawful management of a non-dangerous product may be mere negligence. In measuring punitive damages "the enormity and nature of the wrong" must be assessed.

In this case the risk of danger was the grave possibility that the recipient of the lens would go blind in the implanted eye. The Style 10 lens itself is an inherently dangerous product given that it is an experimental device inserted directly into the eye with potentially disastrous consequences in the event of product failure. Accordingly, a broader range of improper conduct with respect to such a product is sufficient to demonstrate a culpable mental state.

Under the evidence presented by Plaintiffs, Surgidev knew as early as 1982 that Style 10 was substantially more dangerous when implanted using the ICCE procedure than the ECCE procedure; it knew that the rates of sight-threatening complications for the ICCE procedure were well outside the FDA's acceptable levels; and it knew that the Panel had singled out the Style 10 from the field of intraoccular lenses by making its recommendation for premarket approval contingent on the additional requirement that Surgidev give notice of the differences between the ICCE and ECCE procedures in its labelling.

Evidence of Surgidev's initial promotion of the Style 10 for insertion by the ICCE procedure without any warnings to the implanting surgeons of the risks involved, and its continued promotion as late as 1988 in the face of mounting evidence corroborating the problems reflected by the 1982 data, is sufficient to demonstrate a reckless disregard for the safety and welfare of patients receiving Style 10 lenses. As the court in *Baker v. Firestone Tire & Rubber Co.*, 793 F.2d 1196 (11th Cir.1986), noted:

> A legal basis for punitive damages is established in products liability cases where the manufacturer is shown to have knowledge that its product is inherently dangerous to persons or property and that its continued use is likely to cause injury or death, but nevertheless continues to market the product without making feasible modifications to eliminate the danger or *making adequate disclosure and warning of such danger.*

*Id.* at 1200 (emphasis added); *see also O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438, 1446 (10th Cir.1987) (noting that Playtex's promotion of its product with knowledge of studies showing causal link to toxic shock syndrome constituted reckless indifference to the rights of others), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988); *Cerretti v. Flint Hills Rural Elec. Coop. Ass'n,* 251 Kan. 347, 837 P.2d 330, 346 (1992) ("If a [defendant] has reason to believe its act may injure another, and so acts with indifference to whether it does or not, the [defendant] is guilty of wanton conduct."); *Piper v. Bear Medical Sys.*, 180 Ariz. 170, 883 P.2d 407, 417 (Ct.App.1993) ("A jury may infer an evil mind if defendant deliberately continued [its] actions despite the inevitable or highly probable harm that would follow."), *review denied* (Nov. 1, 1994).

Surgidev counters that its compliance with FDA regulations precludes an award of punitive damages as a matter of law. It cites to *Hines v. St. Joseph's Hospital,* 86 N.M. 763, 766, 527 P.2d 1075, 1078 (Ct.App.), *cert. denied,* 87 N.M. 111, 529 P.2d 1232 (1974), for support. However, *Hines* only stands for the limited proposition that compliance with regulations is evidence of due care. Such evidence is not dispositive of the issue of negligence or recklessness. Contrary to Surgidev's assertions, compliance with federal regulations does not preclude a finding of recklessness or an award of punitive damages. *Silkwood v. Kerr–McGee Corp.*, 769 F.2d 1451, 1456–58 (10th Cir.1985)

(upholding punitive damages award despite defendant's compliance with federal nuclear safety regulations), *cert. denied*, 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 356 (1986); *Dorsey v. Honda Motor Co.*, 655 F.2d 650, 656–57 (5th Cir.1981) (noting that compliance with federal safety standards does not preclude a finding of recklessness), *modified on other grounds*, 670 F.2d 21 (5th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *cf.* Restatement (Second) of Torts § 288C (1964) (compliance with regulations does not preclude finding of negligence). Accordingly, Surgidev's evidence of compliance with FDA regulations was properly submitted to the jury for consideration in determining whether Surgidev acted recklessly in failing to warn of problems with the Style 10 when implanted using the ICCE procedure.[7]

Viewing the evidence in the light most favorable to the verdict, we find that there was substantial evidence supporting the Plaintiffs' contention that Surgidev promoted the Style 10 for implantation by the ICCE procedure with "utter indifference to the consequences." *Ferrellgas*, 118 N.M. at 269, 881 P.2d at 14. The trial court did not abuse its discretion by rejecting Surgidev's motion for a directed verdict and submitting the issue of punitive damages to the jury.

## VI. BAILIFF AND JUROR MISCONDUCT

Finally, Surgidev argues that two separate acts of misconduct by the bailiff warrant a new trial. First, on the day before closing argument, three jurors and an alternate juror saw the bailiff drive away with Gonzales at the lunch break, and later saw the two having coffee together at Arby's. Second, Surgidev alleges that the bailiff refused to bring exhibits requested by a juror during deliberations and failed to notify the court of the juror's request. Surgidev also alleges that the foreman refused to write a note to the judge on behalf of a juror. Based on this information, Surgidev moved for a new trial. The judge conducted a hearing in which he heard testimony from several jurors and the bailiff, and reviewed juror affidavits. After reviewing the evidence, the judge denied the motion for a new trial.

■ It is within a trial court's discretion whether to grant a motion for a new trial based on bailiff misconduct, and we will review that decision only to determine whether the court abused its discretion. *Prudencio v. Gonzales*, 104 N.M. 788, 789, 727 P.2d 553, 554 (Ct.App.), *cert. denied*, 104 N.M. 761, 726 P.2d 1391 (1986). We note that in a claim of bailiff and jury misconduct "the general rule is that affidavits and testimony of jurors, presented after jury discharge, cannot be used to impeach the jury verdict." *Hurst v. Citadel, Ltd.*, 111 N.M. 566, 568, 807 P.2d 750, 752 (Ct.App.), *cert. denied*, 111 N.M. 529, 807 P.2d 227 (1991). However, juror testimony and affidavits may be admissible to determine "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." SCRA 1986, 11–606(B) (Repl. Pamp.1994); *see also Prudencio*, 104 N.M. at 789–90, 727 P.2d at 554–55.

■ Our Court of Appeals has long held that in cases involving improper communications or extraneous prejudicial information reaching the jury, prejudice is presumed. *Budagher v. Amrep Corp.*, 100 N.M. 167, 171, 667 P.2d 972, 976 (Ct.App.), *cert. denied*, 100 N.M. 192, 668 P.2d 308 (1983). If there is a reasonable possibility that the claimed error may have affected the jury, a rebuttable presumption of prejudice arises. *Id.; see also State v. Beal*, 48 N.M. 84, 92, 146 P.2d 175, 180 (1944).

■ In the present case we need not determine whether the actions of the bailiff in having coffee with Gonzales fall within the category of extraneous prejudicial information because we find that Plaintiffs sufficiently demonstrated that no prejudice occurred. Only three jurors and one alternate juror witnessed the lunch in question, and they did not discuss it with the other jurors. The

---

7. In addition, we note that the issue of Surgidev's compliance with FDA regulations was in fact hotly contested by Plaintiffs, who presented evidence that Surgidev failed to comply with numerous FDA regulations.

alternate juror was excused before jury deliberations. At the restaurant, neither the bailiff nor Gonzales made any attempt to communicate with the jurors and the jurors did not hear any conversations between the two. The bailiff did not seek out the jurors, did not attempt to promote Gonzales's claim, and did not indicate to the jury that he had any relationship with Gonzales. *Compare Prudencio,* 104 N.M. at 789, 727 P.2d at 554 (noting jurors were aware that bailiff was defendant's brother-in-law and that bailiff was trying to influence the jury). Furthermore, the jury never discussed the encounter during its deliberations. Although we note that having lunch with a plaintiff is inappropriate behavior for an officer of the court, in this case Plaintiffs presented evidence that the meeting was an isolated and innocuous occurrence. Accordingly, we find that the trial court did not abuse its discretion in holding that Plaintiffs rebutted any presumption of prejudice against Surgidev.

Surgidev's second claim is that the bailiff refused to bring an exhibit requested by one of the jurors into the jury room. The juror, Virginia Starquist, testified that she wanted to see the package insert that was included with the Style 10 lens sent to ophthalmologists but that the bailiff refused to bring it to her. However, the bailiff and several other jurors testified that the bailiff brought a stack of papers several inches high into the jury room. They testified that this stack included all the exhibits in the trial except for the binders containing FDA panel hearing transcripts and premarket approval documents as well as several poster-sized blow-ups of charts and documents, which were never requested by the jurors. Thus the package insert for which Starquist was searching was already in the jury room according to the other jurors. Furthermore, the bailiff and the other jurors also testified that the bailiff always brought any exhibits the jury requested and that he never refused any of Starquist's requests. We find that Plaintiffs presented sufficient evidence to rebut Surgidev's claim of bailiff misconduct.

Finally, Surgidev alleges that the foreperson refused to write a note to the judge on behalf of Starquist. However, this refusal does not rise to the level of extraneous prejudicial information brought to the jury's attention nor improper influence brought to bear upon a juror. A jury foreperson is not obligated to communicate with the judge on behalf of another juror. The trial court made it clear that any juror could write a note to the judge if there was a question. There is no indication in the record that the foreperson or the other jurors gave Starquist any instructions to the contrary or lead her to believe she could not contact the judge herself. Therefore, no presumption of prejudice would arise from the alleged refusal, and Surgidev has not demonstrated that it was in fact prejudiced. In addition, Plaintiffs presented testimony by the foreperson contradicting Starquist's testimony. Accordingly, we find that the trial court did not abuse its discretion in denying Surgidev's motion for a new trial based on juror or bailiff misconduct.

## VII. PREJUDGMENT INTEREST

Plaintiffs cross-appeal, claiming that the trial court improperly denied their motion to amend the judgment to include prejudgment interest as allowed under NMSA 1978, § 56–8–4(B) (Repl.Pamp.1986). Plaintiffs contend that the trial court abused its discretion by failing to set forth specific findings of fact supporting its denial of prejudgment interest. Section 56–8–4(B) provides:

> The court in its discretion may allow interest of up to ten percent from the date the complaint is served upon the defendant after considering among other things:
>
> (1) if the plaintiff was the cause of unreasonable delay in the adjudication of the plaintiff's claims; and
>
> (2) if the defendant had previously made a reasonable and timely offer of settlement to the plaintiff.

Plaintiffs argue that the trial court is required to make specific findings with regard to the two factors listed in Section 56–8–4(B) when awarding or denying prejudgment interest and that failure to do so is an abuse of discretion. For support, Plaintiffs rely on two cases discussing the need for findings of fact, *Mascarenas v. Jaramillo,* 111 N.M. 410,

414–15, 806 P.2d 59, 63–64 (1991) (remanding for specific findings) and *Ranch World v. Berry Land & Cattle Co.*, 110 N.M. 402, 404, 796 P.2d 1098, 1100 (1990) (holding absence of findings constituted an abuse of discretion). However, a careful reading of these cases reveals that they involved contract claims in which the prevailing parties were entitled to prejudgment interest as a matter of right. In *Sunwest Bank v. Colucci*, 117 N.M. 373, 377–79, 872 P.2d 346, 350–52 (1994), this Court explained the difference between contract claims, in which the plaintiff is entitled to prejudgment interest as a matter of right under NMSA 1978, § 56–8–3 (Repl.Pamp.1986),[8] and other claims, such as tort claims, where an award of prejudgment interest is in the trial court's discretion under Section 56–8–4(B). We noted in *Sunwest Bank* that when the plaintiff is entitled to prejudgment interest *as a matter of right,* "the absence of any findings by the trial court to justify its denial of prejudgment interest ... [is] an abuse of discretion." *Id.* at 379, 872 P.2d at 352. The same is not true for a denial of a discretionary award of prejudgment interest under Section 56–8–4(B).

Under Section 56–8–4(B), the trial court does not need to make specific factual findings as is required under Section 56–8–3. The court's reasons for denying prejudgment interest need only be ascertainable from the record and not contrary to logic and reason. *Cf. Lucero v. Aladdin Beauty Colleges, Inc.*, 117 N.M. 269, 272, 871 P.2d 365, 368 (1994) (noting that the trial court did not expressly find that defendant's settlement offer was unreasonable but inferring from the record that the trial court believed the offer was unreasonable). In addition, the two factors listed in Section 56–8–4(B) are not exclusive; the trial court should take into account all relevant equitable considerations that further the goals of Section 56–8–4(B).

In the present case it is apparent from the record that the trial court considered Plaintiffs' request for prejudgment interest to be untimely because it was made after the court had already entered final judgment in the case. The court noted that it initially considered a proposed judgment one month earlier, in December, which both parties had agreed to, and which did not include a request for prejudgment interest. Plaintiffs did not request prejudgment interest until after the court entered a final judgment in January. In addition, the court acknowledged that Surgidev was not responsible for the two-month delay between the jury verdict and the entry of judgment. We also note that before trial Surgidev did make settlement offers of $90,000 for each plaintiff, which were not unreasonable as a matter of law.

We have previously noted that the purpose of Section 56–8–4(B) "is to foster settlement and *prevent delay.*" *Lucero,* 117 N.M. at 272, 871 P.2d at 368 (emphasis added). Accordingly, under the circumstances, we find that the trial court did not abuse its discretion by denying Plaintiffs' untimely motion for prejudgment interest.

## VIII. CONCLUSION

For the foregoing reasons we affirm the judgment entered against Surgidev for compensatory and punitive damages. We also affirm the trial court's denial of Plaintiffs' motion for prejudgment interest.

IT IS SO ORDERED.

RANSOM and FRANCHINI, JJ., concur.

---

**8.** Section 56–8–3 provides:
> The rate of interest, in the absence of a written contract fixing a different rate, shall be not more than fifteen percent annually in the following cases:
> A. on money due by contract;
> B. on money received to the use of another and retained without the owner's consent expressed or implied; and
> C. on money due upon the settlement of matured accounts from the day the balance is ascertained.