Certiorari Denied, January 12, 2017, No. S-1-SC-36235

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2017-NMCA-019

Filing Date: November 22, 2016

Docket No. 34,226 (consolidated with No. 34,461)

DARREL ALLRED, ROBERT ALLRED,
JOHN ALLRED, BRUCE ALLRED, and
DWAYNE ALLRED,

      Plaintiffs-Appellees,

v.

NEW MEXICO DEPARTMENT
OF TRANSPORTATION,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF CATRON COUNTY
Kevin R. Sweazea, District Judge

Domenici Law Firm, P.C.
Pete V. Domenici, Jr.
Albuquerque, NM

for Appellees

Miller Stratvert P.A.
Cody R. Rogers
Luke A. Salganek
Las Cruces, NM

for Appellant

OPINION

WECHSLER, Judge.

{1}    Appellant New Mexico Department of Transportation appeals the district court's

1

finding of contempt and award of judicial sanctions in the amount of $408,764. Appellant also appeals the district court's award of attorney fees and costs in the amount of $54,301.41. With respect to the district court's finding of contempt, Appellant argues that the district court lacked subject matter jurisdiction or, in the alternative, erroneously interpreted a "settlement agreement" between the parties. Because we conclude that a portion of the "settlement agreement" was an enforceable injunctive order, which was appropriately interpreted by the district court, these arguments lack merit. Appellant additionally argues that the district court's (1) finding of contempt was not supported by substantial evidence or was invalidated by evidentiary error, (2) award of judicial sanctions was not supported by substantial evidence or resulted from an abuse of discretion, and (3) calculation of damages was erroneous. We decline to accept these arguments except with respect to the district court's calculation of damages, to which we apply a $15,000 reduction.

{2}      As to Appellant's appeal of the district court's award of attorney fees and costs, our review of Appellant's brief in chief and reply brief reveals insufficient discussion and legal analysis from which to formulate an opinion. As such, we consider these issues to be abandoned.

**BACKGROUND**

{3}      Appellees Darrel, Robert, John, Bruce, and Dwayne Allred own and operate a farming and livestock operation on lands adjacent to Whitewater Creek in Glenwood, New Mexico. The Whitewater Creek Bridge (the Bridge) spans U.S. Highway 180. Appellant constructed and maintains the Bridge. Since its reconstruction in 1981, sediment aggradation has occurred at and about the Bridge. This sediment aggradation resulted in an increased risk of flooding over time. Because of this increased risk, on June 17, 2011 Appellees filed this action for negligence, inverse condemnation, injunctive relief, and damages.

{4}      During the pendency of the litigation, Appellees requested and were granted a preliminary injunction related to the maintenance of the Whitewater Creek bed (the Creek bed). The preliminary injunction required that Appellant (1) update its pre-construction notice (PCN); (2) provide the updated biological assessment and environmental analysis as required by the United States Army Corps of Engineers (ACE) or the United States Fish and Wildlife Service; (3) submit a construction plan to ACE, including a subsequent maintenance plan sufficient to put the Creek bed and the Bridge in compliance with the 1981 design standards; and (4) undertake the maintenance operation and promptly prosecute the maintenance to completion within thirty days of ACE approval of the updated PCN. The preliminary injunction further required that Appellant regularly maintain the Creek bed in accordance with the PCN.

{5}      ACE approved the updated PCN, and Appellant began maintenance on the Creek bed on March 14, 2012. This maintenance progressed until a dispute related to the construction specifications halted progress. On April 12, 2012, the parties entered court-ordered mediation. This mediation resulted in an agreement in principle as to the terms of a

permanent maintenance plan, which the parties referred to as a permanent injunction.

**{6}** On December 10-11, 2012, the parties signed a Settlement Agreement and Mutual Release (Settlement Agreement). The Settlement Agreement outlined the Terms of Settlement as (1) the entry of a Stipulated Permanent Injunction Order (Permanent Injunction) and (2) dismissal of the lawsuit by "execut[ion of] the attached Stipulated Motion of Voluntary Dismissal With Prejudice." The Settlement Agreement additionally contained an arbitration provision triggered by the failure of "any party . . . to perform any of the promises made in this [a]greement[.]"

**{7}** On January 18, 2013, the district court ordered entry of the Permanent Injunction, which detailed the parties' rights and obligations with respect to the maintenance plan. The Permanent Injunction contained a "maintenance trigger" that required Appellant to undertake maintenance efforts "when the average distance between sediment accumulations to the low chord of the [B]ridge is [seven] feet." Additionally, the Permanent Injunction detailed the scope of Appellant's maintenance obligation and described circumstances under which the Permanent Injunction could require amendment and protocol for such amendment. Finally, the Permanent Injunction provided that "[t]he terms set forth herein resolve all pending issues related to the injunctive relief requested by the [Appellees]. Title and compensation issues between the [p]arties shall be disposed of and resolved through a separate simultaneously executed settlement agreement and release."

**{8}** On February 25, 2013, the parties jointly filed a Motion for Entry of Stipulated Permanent Injunction and Voluntary Dismissal With Prejudice of All Remaining Claims and Counterclaims (Motion for Entry and Voluntary Dismissal). The motion stated, in pertinent part,

> The Parties notify this [c]ourt that they have entered a Stipulated Permanent Injunction that details a maintenance plan for [Whitewater] Creek, above, below and under the U.S. 180 bridge in Glenwood, New Mexico, Catron County as detailed therein.
>
> The Parties further notify this [c]ourt that they have settled the remaining disputes between them in the underlying lawsuit and pursuant to Rule 1-041(A)(1)(b) [NMRA], hereby stipulate to the voluntary dismissal with prejudice of all claims and counterclaims, known or unknown, raised in this lawsuit or that could have been raised, against the Parties.

**{9}** On February 27, 2013, the district court entered its Order of Dismissal With Prejudice of All Remaining Claims (Order of Dismissal), which stated, in pertinent part,

> THIS MATTER having come before the [c]ourt upon the Parties' notice of entry of Stipulated Permanent Injunction detailing a maintenance plan on Whitewater Creek as detailed therein, and further notice of settlement

3

of the remaining disputes between them in the underlying lawsuit, and stipulation to the voluntary dismissal with prejudice of all claims and counterclaims, known or unknown, raised in this lawsuit or that could have been raised by the Parties;

The [c]ourt being otherwise fully advised in the premises FINDS that the stipulation is well-taken and is hereby GRANTED. All claims and counterclaims raised or that could have been raised by the Parties in this lawsuit are dismissed with prejudice upon the entry of this [c]ourt's Order, and each party shall bear its own fees and costs.

**{10}** On July 28, 2013, Appellees notified Appellant that sediment levels in the Creek bed required maintenance. Beginning on August 2, 2013, Appellant dispatched employees to remove sediment from the Creek bed in accordance with the Permanent Injunction. For the majority of the time between August 2, 2013 and approximately August 26, 2013, Appellant assigned two employees to the project. Appellee Darrel Allred used his bulldozer to assist these employees for approximately one hundred fifty hours during the month of August. On approximately August 26, 2013, Appellant determined that a heavy equipment crew was required to complete the project and ordered its employees to discontinue their maintenance efforts. This discontinuation was premature and left the Creek bed out of compliance with the terms of the Permanent Injunction. The heavy equipment crew was scheduled to arrive at Whitewater Creek on September 16, 2013. During the intervening weeks, several rain events deposited additional sediment in the Creek bed.

**{11}** On the night of September 14, 2013, a substantial rain event occurred, causing storm water to flow down Whitewater Creek and, ultimately, to overtop the Bridge and flow through Appellees' property downstream from the Bridge. Additionally, storm water backed up at the Bridge and overtopped the upstream dikes on both sides of Whitewater Creek, causing damage to the dikes themselves, as well as irrigated fields, irrigation systems, and crops.

**{12}** On September 17, 2013, Appellees filed a Verified Motion to Enforce Permanent Injunction For Relief for Violation of Permanent Injunction (Verified Motion to Enforce). This motion requested an emergency hearing "to determine and order appropriate remedial actions [Appellant] must take, and grant any further relief the [c]ourt deems justice requires." In the weeks between the filing of the motion and the emergency hearing on October 9, 2013, Appellant reentered the Creek bed and removed sediment in accordance with the Permanent Injunction.

**{13}** At the October 9, 2013 hearing, Appellees clarified that they were no longer seeking emergency relief but hoped to "move[] this matter forward in the direction of some appropriate sanction for violation of the [Permanent Injunction] order." After attorney argument and testimony, the district court ruled that Appellant "violated the stipulated [Permanent Injunction] order by failing to diligently pursue maintenance until completion[.]"

4

Appellees were given leave to petition the district court for damages and sanctions—the appropriateness of which was to be determined at a subsequent hearing on the issues of liability, causation, and damages. Neither of the parties raised the issue of subject matter jurisdiction in the pre-hearing briefing or at the hearing. On November 8, 2013, Appellant filed a motion to reconsider, which argued, generally, that its conduct did not violate the Permanent Injunction. This motion was denied.

{14}    On November 21, 2013, Appellees filed a petition for sanctions and damages for Appellant's violation of the Permanent Injunction. The petition alleged that Appellant was liable for damages to Appellees' property. The district court scheduled a motion hearing on June 25-26, 2014 and set a June 1, 2014 discovery deadline.

{15}    During discovery, the pending hearing was rescheduled for July 24-25, 2014. On July 21, 2014, counsel for Appellant sent a letter to the district court and counsel for Appellees asserting that, effective February 27, 2013, the district court lacked subject matter jurisdiction over the case. This letter posited that an entry of voluntary dismissal "terminates a case, leaving the district court without jurisdiction to take[] any further action in the case." The letter additionally posited that, per the Settlement Agreement, arbitration was the appropriate forum for resolving Appellees' claims. Following a telephonic hearing related to the letter, Appellant filed motions (1) to enforce the Settlement Agreement and dismissal (Motion to Enforce) and (2) to vacate (Motion to Vacate) the pending hearing for lack of subject matter jurisdiction. The Motion to Enforce focused on the interplay between the Settlement Agreement, its arbitration provision, and the Permanent Injunction. The Motion to Vacate expressly asserted that the district court lacked subject matter jurisdiction over Appellees' claims following the parties' voluntary dismissal.

{16}    At the outset of the July 24, 2014 hearing, the district court considered the merits of the Motion to Enforce and the Motion to Vacate. The central issues were (1) whether the Settlement Agreement incorporated the Permanent Injunction such that Appellees' claims were subject to arbitration and (2) if the Permanent Injunction was incorporated, did Appellant's failure to timely assert its right to arbitrate constitute a waiver. The district court ruled in favor of Appellees, specifically concluding that "it does not appear that the provisions of the injunction are subsumed within the requirement of arbitration." The district court did not rule, nor did Appellant orally raise, the effect of the stipulated voluntary dismissal on the district court's subject matter jurisdiction.

{17}    During the hearing, Appellees presented testimony and evidence on topics including: (1) the September 14, 2013 flood event; (2) damage to personal property; and (3) the cost to repair such damage. Appellees offered expert witness testimony by Walter L. Niccoli, which described the likely sequence of events on September 14, 2013 and the causal relationship between Appellant's violation of the Permanent Injunction and damages suffered by Appellees. As a counterpoint to Niccoli's testimony, Appellant intended to introduce expert witness testimony by John Wallace. However, the district court excluded Wallace's testimony as a sanction for discovery violations. After this ruling, Appellant

moved to strike Niccoli's testimony. This motion was granted in part with respect to testimony related to sediment aggradation in the Creek bed.

**{18}** The district court concluded that it had jurisdiction over the motions before it, including Appellees' Petition for Sanctions, under Article VI, Section 13 of the New Mexico Constitution. The district court ruled that (1) Appellant's violation of the Permanent Injunction constituted contempt, (2) a causal relationship existed between Appellant's violation of the Permanent Injunction and Appellees' damages, and (3) Appellees suffered damages in the amount of $408,764. The district court ordered sanctions in the form of compensatory damages in the amount of $408,764. The parties also litigated attorney fees and costs, which resulted in an award to Appellees in the amount of $54,301.41.

**{19}** Appellant timely filed notice of appeal of the district court's ruling on the merits and its award of attorney fees and costs. These appeals were consolidated by order of this Court.

## SUBJECT MATTER JURISDICTION

**{20}** "Subject matter jurisdiction is the power to adjudicate the general questions involved in the claim[.]" *Gonzales v. Surgidev Corp.*, 1995-NMSC-036, ¶ 12, 120 N.M. 133, 899 P.2d 576. As a general rule, a court has subject matter jurisdiction over claims that "fall[] within the general scope of authority conferred upon such court by the constitution or statute." *Id.* (internal quotation marks and citation omitted). A judgment entered by a court lacking subject matter jurisdiction has no legal effect. *See State v. Patten*, 1937-NMSC-034, ¶ 11, 41 N.M. 395, 69 P.2d 931 ("There are three jurisdictional essentials necessary to the validity of every judgment, to wit, jurisdiction of parties, jurisdiction of the subject matter, and power or authority to decide the particular matters presented, and the lack of [any] is fatal to the judgment[.]" (emphasis, internal quotation marks, and citations omitted)). The issue of subject matter jurisdiction cannot be waived and may be raised at any time, including on appeal to this Court. *Becenti v. Becenti*, 2004-NMCA-091, ¶ 13, 136 N.M. 124, 94 P.3d 867. We review claims related to subject matter jurisdiction de novo. *Murken v. Solv-Ex Corp.*, 2006-NMCA-064, ¶ 8, 139 N.M. 625, 136 P.3d 1035.

**{21}** Rule 1-041(A) NMRA provides for the voluntary dismissal of a claim brought in a New Mexico district court. The rule states, in pertinent part, "an action may be dismissed by the plaintiff . . . by filing a stipulation of dismissal signed by all parties who have appeared generally in the action." Rule 1-041(A)(1)(b). The effect of such a dismissal "leaves a situation, so far as procedures therein are concerned, the same as though the suit had never been brought; and upon such voluntary dismissal, all prior proceedings and orders in the case are vitiated and annulled, and jurisdiction of the court is immediately terminated." *McCuistion v. McCuistion*, 1963-NMSC-144, ¶ 9, 73 N.M. 27, 385 P.2d 357.

**{22}** Appellant's central argument on appeal is that the Permanent Injunction was subject to the parties' Rule 1-041 voluntary dismissal and, therefore, was unenforceable by the district court. Under *McCuistion*, Appellant's argument would prevail if the Permanent

6

Injunction was subject to the Order of Dismissal entered by the district court. For the reasons discussed below, however, we conclude that it was not.

**The District Court's Order of Dismissal**

{23}     A judgment "must be certain and unequivocal" such that it "dispose[s] of the matters at issue between the parties that they . . . will be able to determine with reasonable certainty the extent to which their rights and obligations have been determined[.]" *Hollingsworth v. Hicks*, 1953-NMSC-045, ¶ 26, 57 N.M. 336, 258 P.2d 724 (internal quotation marks and citation omitted). While appellate courts draw certain distinctions between stipulated judgments and judgments on the merits, no such distinctions apply when construing a judgment's intended effect. *Compare id.* ¶ 30 (construing a judgment on the merits), *with Mundy & Mundy, Inc. v. Adams*, 1979-NMSC-084, ¶ 20, 93 N.M. 534, 602 P.2d 1021 (construing a stipulated judgment). When a judgment is "clear and unambiguous . . . [i]t must stand and be enforced as it speaks." *Parks v. Parks*, 1978-NMSC-008, ¶ 20, 91 N.M. 369, 574 P.2d 588. However, if "the meaning is obscure, doubtful, or ambiguous, the judgment, pleadings, and entire record may always be resorted to for the purpose of aiding in the construction thereof." *Hollingsworth*, 1953-NMSC-045, ¶ 30. Our goal in construing an ambiguous judgment is "to determine the intention and meaning of the author[.]" *Id.* ¶ 31. Stipulations incorporated into a court's judgment are "construed liberally to give effect to the intent of the parties." *Parks*, 1978-NMSC-008, ¶¶ 15-16.

{24}     As discussed above, the Order of Dismissal resulted from the parties' Motion for Entry and Voluntary Dismissal. The Order of Dismissal separately detailed the parties' agreement as to (1) a maintenance plan for Whitewater Creek, by way of the Permanent Injunction; (2) settlement of the remaining disputes in the underlying lawsuit; and (3) "voluntary dismissal with prejudice of all claims and counterclaims . . . raised in th[e] lawsuit[.]" The Order of Dismissal did not expressly reserve authority to the district court to enforce the Permanent Injunction. However, the Permanent Injunction itself implies ongoing enforcement authority, stating,

> The Parties recognize that if regulatory changes or conditions are unilaterally implemented by any controlling state or federal agency that impacts the ability of [Appellant] to comply with the terms of this Order, the Parties recognize [Appellant] will need to comply with those regulatory requirements[.] . . . In the event there is not agreement between the Parties that regulatory changes or conditions were unilaterally implemented by any controlling state or federal agency that impacts the ability of [Appellant] to comply with the terms of this Order, [Appellant] must request and obtain modification to the permanent injunction.

> The Parties recognize that if site conditions change such that [Appellant's] ability to comply with the terms of this Order is impacted,

7

[Appellant] will advise the principal [Appellee] Darrel Allred of such changes. In the event there is not agreement between the Parties that site conditions change such that [Appellant's] ability to comply with the terms of this Order is impacted, [Appellant] must request and obtain modification to the permanent injunction.

**{25}** Appellees argue that the parties did not, in dismissing all remaining claims, intend to limit the district court's enforcement power with respect to the Permanent Injunction. Appellant argues that the Motion for Entry and Voluntary Dismissal indicated the parties' intent to terminate the district court's jurisdiction over the Permanent Injunction. The Order of Dismissal does not clearly indicate which of these positions was intended by the parties' stipulated dismissal of "all remaining claims." This ambiguity requires that we look to the entire record to construe the judgment. *Parks*, 1978-NMSC-008, ¶ 16; *Hollingsworth*, 1953-NMSC-045, ¶ 30.

**{26}** The Permanent Injunction itself is particularly illuminating as to the intent of the parties. First, the district court entered the Permanent Injunction on January 18, 2013—more than six weeks before its entry of the Order of Dismissal, which dismissed "all remaining claims." Additionally, the Permanent Injunction contemplated the possibility that regulatory or site condition changes could impact Appellant's ability to comply with its maintenance obligations. It also contemplated disagreement between the parties, such that Appellant "must request and obtain modification to the [Permanent Injunction]." The Permanent Injunction did not expressly indicate to which entity such a request was to be made. However, because the district court entered the Permanent Injunction on January 18, 2013 and no alternate forum was indicated on that date, the obvious implication is that any request for modification would be made to the district court. The power to modify the Permanent Injunction implies ongoing enforcement authority.

**{27}** Generally speaking, the inclusion of an express reservation or repudiation of ongoing judicial enforcement authority within an order of dismissal limits the need for such analysis. *See, e.g.*, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381-82 (1994) (discussing the retention of judicial authority by the consent of the parties over settlement agreements that result in voluntary dismissal). However, having conducted the analysis, we conclude that the Permanent Injunction was not subject to the Order of Dismissal. Therefore, the district court retained authority to enforce the Permanent Injunction and had subject matter jurisdiction over Appellees' Verified Motion to Enforce.

**THE PERMANENT INJUNCTION**

**{28}** In the alternative, Appellant asserts numerous errors by the district court in interpreting or construing the Permanent Injunction, including: (1) that the Settlement Agreement and the Permanent Injunction functioned as a contract between the parties, such that claims arising from a violation of the Permanent Injunction were subject to arbitration; (2) that the district court improperly reformed the Permanent Injunction by adding and

omitting terms; and (3) that the district court erroneously concluded that Appellant violated the Permanent Injunction. To the extent that our analysis requires, we review questions of contractual interpretation de novo. *Thompson v. Potter*, 2012-NMCA-014, ¶ 12, 268 P.3d 57.

**The Nature of the Permanent Injunction**

**{29}**    As a general rule, a stipulated judgment "is not considered to be a judicial determination, but a contract between the parties[.]" *Williams v. Crutcher*, 2013-NMCA-044, ¶ 8, 298 P.3d 1184. However, discussing this general rule in *Pope v. Gap, Inc.*, this Court clarified that stipulated judgments have characteristics of both judgments and contracts. *See* 1998-NMCA-103, ¶ 22, 125 N.M. 376, 961 P.2d 1283 ("[A consent judgment] is similar to a judgment because it is entered and enforceable as a judgment; however, it is like a contract because its terms and conditions are reached by the mutual agreement of the parties."). Inasmuch as *Williams*' statement of our general rule would subject the Permanent Injunction to a pure contract law analysis, the injunctive relief granted in this particular case is distinguishable from the general rule.

**{30}**    *United States v. City of Miami*, 664 F.2d 435 (5th Cir. 1981) (per curiam), cited by this Court in *Pope*, is instructive. In that case, the attorney general filed a complaint against the city of Miami (the City) and the Fraternal Order of Police (FOP) for discriminating against certain protected classes of individuals in violation of the Fourteenth Amendment and federal law. *City of Miami*, 664 F.2d at 436. The complaint sought both temporary and permanent injunctive relief. *Id.* Post-complaint negotiations resulted in a proposed consent decree that was signed by both the United States and the City. *Id.* at 438. The district court approved and entered the consent decree over objections by the FOP. *Id.* Shortly thereafter, the FOP filed a motion to vacate the consent decree, which the district court granted. *Id.* After a hearing, the United States and the City submitted a modified consent decree. *Id.* at 439. The district court entered the modified consent decree over continued objection by the FOP, finding that "the decree does not violate the contractual relationship between [the parties and] . . . [t]he consent reached is constitutionally valid." *Id.* (internal quotation marks omitted). The modified consent decree included language stating that the defendants "are permanently enjoined and restrained from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against [the protected classes.]" *Id.* (internal quotation marks omitted). The FOP appealed the entry of the consent decree. *Id.*

**{31}**    In discussing the principles underlying consent decrees, the Fifth Circuit stated,

> When presented with a proposed consent decree, the court's duty is akin, but not identical to its responsibility in approving settlements of class actions, stockholders' derivative suits, and proposed compromises of claims in bankruptcy. In these situations, the requisite court approval is merely the ratification of a compromise. The court must ascertain only that the settlement is "fair, adequate and reasonable."

9

Because th[is] consent decree does not merely validate a compromise but, *by virtue of its injunctive provisions*, reaches into the future and has continuing effect, its terms require more careful scrutiny. Even when it affects only the parties, the court should, therefore, examine it carefully to ascertain not only that it is a fair settlement but also that it does not *put the court's sanction on and power behind* a decree that violates Constitution, statute, or jurisprudence.

*Id.* at 441 (emphasis added) (footnotes omitted).

**{32}** The judicial process outlined in *City of Miami* is more analogous to the current case than *Williams* or other New Mexico appellate cases that define stipulated or consent judgments as contractual in nature. *See, e.g.*, *Owen v. Burn Constr. Co.*, 1977-NMSC-029, 90 N.M. 297, 563 P.2d 91 (discussing a stipulated judgment arising from the settlement of claims for property damage); *State ex rel. State Highway Comm'n v. Clark*, 1968-NMSC-057, 79 N.M. 29, 439 P.2d 547 (discussing a stipulated judgment arising from the settlement of eminent domain proceedings); *La Luz Cmty. Ditch Co. v. Town of Alamogordo*, 1929-NMSC-044, 34 N.M. 127, 279 P. 72 (discussing a stipulated judgment arising from the settlement of claims related to water rights); *Williams*, 2013-NMCA-044 (discussing a stipulated judgment arising from the settlement of claims related to trust distributions).

**{33}** In *Owen*, for example, the defendant was employed by a municipal redevelopment agency to demolish a hotel adjacent to the plaintiffs' restaurant. 1977-NMSC-029, ¶ 2. During the demolition, the defendant's negligence caused the hotel to fall onto and destroy the restaurant. *Id.* The plaintiffs reached a settlement with the agency to compensate them for the value of the lot. *Id.* ¶ 3. The terms of the settlement were entered as a judgment by the district court. *Id.* The plaintiffs then filed a lawsuit against the defendant for damages to the physical structure. *Id.* ¶ 4.

**{34}** In this context, the stipulated judgment, which memorialized the settlement agreement between the plaintiffs and the agency, was more like a contract than a judgment. The plaintiffs and the agency determined, among themselves, the value of the lot. After payment of the stipulated amount, the plaintiffs and the agency had no additional rights or obligations with respect to the other. The district court unquestionably had no ongoing enforcement obligations. As such, the district court's role was, as described in Appellant's brief in chief, "ministerial."

**{35}** The stipulated judgment in *Owen* is simply not analogous to that in the current case. On June 17, 2011, Appellees filed a complaint alleging negligence and requesting injunctive relief related to Appellant's maintenance obligation at the Bridge. Appellees' request for injunctive relief specifically requested that the district court "requir[e Appellant] to immediately begin restoring the Whitewater Creek Bridge to 1981 design standards[.]" After an evidentiary hearing, the district court issued a preliminary injunction, ordering Appellant to "submit to the ACE a construction notice with a specific plan for immediate maintenance

of the Whitewater Creek and the Bridge" including "a subsequent maintenance plan that is sufficient to put the [C]reek bed and [the] Bridge in compliance with the 1981 design standards of the Bridge." The preliminary injunction additionally provided that regular creek bed maintenance "shall be undertaken" until further order of the court.

**{36}** Appellant argues on appeal that the Permanent Injunction is contractual in nature because it resulted from negotiations between the parties. However, the preliminary injunction proceedings demonstrate that the district court contemplated the equities involved with granting injunctive relief long before entering the Permanent Injunction. Additionally, the terms of the Permanent Injunction—particularly those related to ongoing maintenance requirements placed on Appellant—comport with the legal rationale supporting injunctive relief. *See Insure N.M., LLC v. McGonigle*, 2000-NMCA-018, ¶ 6, 128 N.M. 611, 995 P.2d 1053 ("In determining whether to grant injunctive relief, a [district] court must consider a number of factors and balance the equities and hardships. Some of these factors include: (1) the character of the interest to be protected; (2) the relative adequacy to the plaintiff of an injunction, when compared to other remedies; (3) the interests of third parties; (4) the practicability of granting and enforcing the order; and (5) the relative hardship likely to result to the defendant if granted and to the plaintiff if denied." (internal quotation marks and citations omitted)). Given this procedural history, the district court's role in entering the Permanent Injunction was more than ministerial.

**{37}** Despite being the product of a stipulation between the parties, the Permanent Injunction is a judgment of the district court and not merely a memorialization of a contractual agreement. Because the Permanent Injunction is a judgment, it is enforceable by the district court and not subject to the arbitration clause contained within the Settlement Agreement. *See* NMSA 1978, § 39-1-5 (1850-1851) ("It shall be the duty of the judge of any court to cause judgment, sentence or decree of the court to be carried into effect, according to law.").

**Interpretation of the Permanent Injunction**

**A.    Terms**

**{38}** Appellant additionally argues that the district court erroneously interpreted the Permanent Injunction by "adding terms not agreed upon by the parties, and omitting terms specifically agreed to by the parties." Because Appellant's argument is premised upon its claim that the Permanent Injunction is a contract, it is, to a degree, inapplicable. However, we apply similar principles in construing contracts and judgments. *See Owen*, 1977-NMSC-029, ¶ 14 ("The rules to be followed in arriving at the meaning of judgments and decrees are not dissimilar to those relating to other written documents. Where the decree is clear and unambiguous, neither pleadings, findings nor matters dehors the record may be used to change or even to construe its meaning."). We therefore review de novo whether the district court's interpretation of the Permanent Injunction resulted in a reformation of the judgment.

11

**{39}** On October 9, 2013, the district court held a hearing on Appellees' Verified Motion to Enforce. After taking testimony related to Appellant's maintenance efforts between August 2, 2013 and approximately August 28, 2013, the district court ruled that Appellant "violated the stipulated permanent injunction order by failing to diligently pursue maintenance until completion[.]"

**{40}** The Permanent Injunction states, in pertinent part, that "[c]ontinuing maintenance required under the PCN shall be performed in conformance with the maintenance plan . . . and shall be diligently pursued until completion recognizing that, *force majeure*, regulatory restrictions, and conditions provided for upon approval of [Appellant's] PCN, or otherwise, will ultimately dictate [Appellant's] maintenance time frames." Appellant argues that the district court's interpretation (1) erroneously established timeliness and resource allocation requirements for the project and (2) ignored provisions that provided Appellant with discretion over maintenance time frames.

**{41}** Appellant's timeliness and resource allocation argument is predicated on its claim that "[t]he unambiguous language of the [Permanent Injunction] requires only that [Appellant] 'diligently pursue maintenance until completion.'" Appellant asserts that the district court's interpretation reformed the Permanent Injunction to "include specific requirements . . . such as 'continuous' pursuit of maintenance, time frames for completion, prioritization of maintenance, size of crew, or equipment used[.]" We disagree. Our review of the record indicates that the district court simply emphasized that the "judgment requires prosecution diligently *to completion*." (Emphasis added.) Appellant never completed the required maintenance prior to discontinuing its efforts on or about August 28, 2013. "[W]here the language of a judgment or decree is clear and unambiguous, . . . [i]t must stand and be enforced as it speaks." *Hollingsworth*, 1953-NMSC-045, ¶ 30. The district court's ruling that Appellant violated the Permanent Injunction by failing to complete its maintenance obligation did not constitute a reformation of the Permanent Injunction by the district court.

**{42}** Appellant's second argument—that it had broad discretion over maintenance time frames—is in two parts and is predicated upon acknowledgment in the Permanent Injunction that certain conditions will "dictate [Appellant's] maintenance time frames." These conditions are "*force majeure*, regulatory restrictions, and conditions provided for upon approval of [Appellant's] PCN, or otherwise[.]"

**{43}** Appellant argues that the "or otherwise" clause is an "important area[] of discretion given to [Appellant] by the [Permanent Injunction]" and that the district court's interpretation of the "or otherwise" clause rendered it "mere surplusage[.]" We disagree. Our reading of the "or otherwise" clause in the context of the entire document indicates that it does not stand alone, but that it instead modifies the immediately preceding phrase, which

itself refers back to an earlier provision related to pending regulatory approval.[1] Given this conclusion, it is Appellant's reading—that the "or otherwise" clause provided seemingly unlimited discretion over maintenance time frames and resource allocation—that renders certain preceding language meaningless. *Cf. Bank of N.M. v. Sholer*, 1984-NMSC-118, ¶ 6, 102 N.M. 78, 691 P.2d 465 ("A contract must be construed as a harmonious whole, and every word or phrase must be given meaning and significance according to its importance in the context of the whole contract.").

**{44}** Appellant additionally argues that monsoonal rains and increased sediment accumulation related to the Whitewater-Baldy Complex fire constituted a *force majeure* excusing compliance with the Permanent Injunction. After taking testimony and evidence, the district court ruled that the physical conditions at and around the Bridge did not constitute a *force majeure* such that Appellant's duty to perform was excused. This conclusion, however unsatisfactory to Appellant, resulted from the district court's analysis of the *force majeure* clause and does not constitute a reformation of the Permanent Injunction by the district court.

## B.   Causation

**{45}** Appellant's final argument in this regard asserts that the district court's conclusion that a causal relationship exists between Appellant's violation of the Permanent Injunction and damages suffered by Appellees is not supported by substantial evidence. In conducting such review, "[w]e are deferential to facts found by the district court, but we review conclusions of law de novo." *Benavidez v. Benavidez*, 2006-NMCA-138, ¶ 21, 140 N.M. 637, 145 P.3d 117. As part of its argument, Appellant claims that the district court erroneously excluded its expert witness. We review the admission of expert testimony for an abuse of discretion. *Leithead v. City of Santa Fe*, 1997-NMCA-041, ¶ 27, 123 N.M. 353, 940 P.2d 459.

### 1.   Admission of Expert Testimony

**{46}** Appellant, citing various case law, asserts that the district court improperly struck its expert witness, John Wallace. Our review of the record does not support Appellant's position.

---

[1]Paragraph two of the Permanent Injunction states, in pertinent part, "[Appellant] will submit to the [ACE] a [PCN] addressing its subsequent maintenance and re-vegetation plan, the scope of which is to read, as much as practicable, as consistent with Exhibit B, as attached, and shall be made pursuant to the terms and conditions set forth below, *subject to approval* of the [ACE], *or as otherwise* directed by regulatory agencies thereto." (Emphasis added). We read this sentence to contemplate additional regulatory action, potentially affecting Appellant's ability to comply with its maintenance obligation under the Permanent Injunction.

**{47}** Rule 1-026 NMRA governs civil discovery, including the admission of expert witness testimony. With respect to expert witness disclosures, the rule provides, in pertinent part,

> A party may through interrogatories and requests for production discover the identity of each person the other party may call as an expert witness at trial, the subject matter on which the expert is expected to testify, and the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

Rule 1-026(B)(6)(a). A failure to make such disclosures is sufficient grounds to exclude expert witness testimony. *See* Rule 1-037(B)(2)(b) NMRA (providing "if a party fails to obey an order under Rule 1-026 . . . , the court in which the action is pending may . . . prohibit[] that party from introducing designated matters in evidence"); *Lewis ex rel. Lewis v. Samson*, 2001-NMSC-035, ¶¶ 13, 16, 131 N.M. 317, 35 P.3d 972 (holding that "lesser sanctions," including the exclusion of witnesses, "may be applied to *any* failure to comply with discovery orders" (internal quotation marks and citation omitted)).

**{48}** During discovery, Appellees propounded interrogatories and requests for production on Appellant, including at least one related to expert witnesses. In response, Appellant named Wallace as its expert witness. Appellant's answer to the interrogatory did not provide information concerning Wallace's opinions, the grounds for those opinions, or the facts, documents, and other information upon which Wallace relied in forming his opinions. Appellant did not provide Appellees with Wallace's expert report.

**{49}** Appellees requested supplementation of Appellant's response to its interrogatories, including "review [of] the opinions and materials Mr. Wallace relied upon in making any expert opinions he intends to offer at [the scheduled] hearing[.]" In the absence of written discovery, Appellees noticed a deposition for Wallace on July 2, 2014. This notice was accompanied by a letter requesting alternate dates if the noticed date presented a scheduling conflict. On June 29, 2014, Appellant notified Appellees of a conflict with the noticed deposition. Appellees indicated availability on July 3, 2014, but they also indicated that additional delays were unacceptable given the proximity to trial. In their response, Appellees reiterated their request for supplementation of discovery materials. Appellant failed to supplement and instead filed a motion for a protective order related to Wallace's noticed deposition and a motion to stay proceedings. Both parties subsequently filed motions in limine to exclude the other's expert witness. The district court declined to address Appellant's motion to stay proceedings due to its untimeliness and reserved its ruling on the motions in limine until the witnesses were called at trial.

**{50}** Appellant called Wallace to testify and elicited his expert qualifications on direct examination. At the outset of Wallace's substantive testimony, Appellees objected and moved to exclude Wallace due to alleged discovery violations. After oral argument by the parties, the district court sustained Appellees' objection, ruling that the "Rule [1-0]26

14

disclosure was inadequate" because it included "no facts and no opinions . . . in [the] disclosure and there is no report that can be referred to instead." Appellant filed a Motion to Reconsider and Offer of Proof (Motion to Reconsider), which the district court denied.

**{51}** Rule 1-037(B) bestows authority on the district court to grant and enforce sanctions for discovery violations. Given Appellant's conduct during the discovery process, the district court did not abuse its discretion by excluding Wallace's expert testimony. Applying the same rationale, the district court also did not abuse its discretion by denying Appellant's Motion to Reconsider.

**2.      Substantial Evidence of Causation**

**{52}** The district court ruled that Appellant's failure to comply with the Permanent Injunction resulted in storm water overtopping both the Bridge and the upstream dikes, "caus[ing] serious damage to [Appellees'] property." Causation is a prerequisite for an award of civil damages, including damages predicated upon a finding of civil contempt. *See El Paso Prod. Co. v. PWG P'ship*, 1993-NMSC-075, ¶ 31, 116 N.M. 583, 866 P.2d 311 ("We hold that once a plaintiff satisfies his [or her] burden of proving violation of a court order, proximate cause, and damages, he or she is entitled to judgment for recovery of those damages."). Appellant argues that this ruling was not supported by substantial evidence or, in the alternative, that lay witness testimony is insufficient to support a finding of causation in the context of flooding. *But see Moore v. Associated Material & Supply Co.*, 948 P.2d 652, 662 (Kan. 1997) ("[W]itnesses who have long been familiar with the flooding patterns of an area are competent to form an opinion as to the cause of flooding."). Appellant's secondary argument was not preserved and is, therefore, not considered by this Court. *See Wolfley v. Real Estate Comm'n*, 1983-NMSC-064, ¶ 5, 100 N.M. 187, 668 P.2d 303 ("[T]heories, defenses, or other objections will not be considered when raised for the first time on appeal.").

**{53}** In support of their claims, Appellees offered expert witness testimony by Niccoli. During discovery, Appellees disclosed Niccoli's expert report, which stated, in pertinent part,

> [M]y opinion is that the Bridge did not have adequate capacity to pass the flow from the Event. Because the Bridge did not have the capacity, it resulted in the flood waters backing up behind the Bridge, damaging or destroying upstream flood containment structures (e.g., dikes), and the flood waters jumping the channel. Had [Appellant] completed [its] maintenance duties on September 5[], 2013, the Event would have passed beneath the Bridge and [would] not have caused the damage[.]

After Niccoli's testimony, Appellant argued that his expert report and answers to interrogatories failed to adequately disclose his theory as to causation. The district court struck certain portions of Niccoli's testimony related to sediment aggradation, but the extent

15

to which this ruling limited Niccoli's testimony is unclear to this Court. Despite passing reference to the district court's ruling in its appellate briefing, Appellant does not provide record citation to the portions of Niccoli's testimony that were struck by the district court or comprehensive analysis of the effect of this evidentiary ruling on our substantial evidence review. *See* Rule 12-213(A)(4) NMRA (requiring the appellant to provide citations to the record proper in support of each argument); *Fenner v. Fenner*, 1987-NMCA-066, ¶ 28, 106 N.M. 36, 738 P.2d 908 (holding that this Court need not consider arguments raised on appeal that are unsupported by citation to the record and transcript).

**{54}** We view Niccoli's expert witness report, quoted above and properly disclosed pursuant to Rule 1-026(B)(6)(a), to provide sufficient notice as to the substance of Niccoli's opinion testimony—that Appellant's failure to complete its maintenance obligation caused (1) a backup of water at the Bridge, (2) storm water to jump the channel upstream and downstream from the Bridge, and (3) damage to Appellees' property. Inasmuch as Niccoli offered testimony consistent with this disclosed theory, it was not subject to the district court's order to strike. An example of such testimony includes:

| | |
|---|---|
| Appellees' Counsel: | So, do you have an opinion as to how that stream was reacting upstream when the water began topping the Bridge and then topped it a little more and then the tree actually impacted the Bridge? What was going on back upstream? |
| Niccoli: | Back upstream, because again the maintenance hadn't occurred, the stream channel was raised, five thousand CFS coming through here. I think Mr. Allred keeps his dikes at about six to nine feet deep, again matching the part down here. So, this only had about two or three feet of clearance that night. There's probably only about three feet of clearance upstream also and there wouldn't be enough capacity in the channel and it probably came up to the level of the dike. As soon as it got to the level of the dike, it started overtopping and the erosive forces would have moved the dike away and caused flooding of the field. |
| Appellees' Counsel: | What about flooding of the pond? |
| Niccoli: | The pond also. . . . There's two things that probably happened at the pond. One which could have been the backup of the water from the plugging of the Bridge loosening the dikes toward the center and into that. And then also this pond here is also on the bend in the river, so the maximum forces are going to be on that |

16

|  |  |
|---|---|
| | outside. So with the stream level raised up due to the lack of maintenance, that water would have wanted to force its way around this corner to the northeast of the upper pond and would have again loosened the dike. And it did obviously loosen it up and water flowed into there. |
| Appellees' Counsel: | And then what happened below the Bridge to what we call the lower pond or the fencing around the lower pond? |
| Niccoli: | Sure. . . . When the water flowed over the top of the [Bridge] and spread out along the road . . . the stream . . . flowed through the property. |

**{55}**     Comments by the district court indicate that its ruling as to causation was informed by both lay and expert witness testimony. With respect to Niccoli's testimony, it stated that

> [the] expert testimony from [Appellees'] expert is, unequivocally, had the cleaning been done . . . the waters would have stayed in the bounds of the creek . . . and would not have overtopped the levees[.] . . . There was also testimony that when the water overtopped the Bridge, it started going on the northwest side of the road, and that that is what caused damage in that area[.]

**{56}**     Based on Niccoli's testimony alone, substantial evidence supported the existence of a causal relationship between Appellant's violation of the Permanent Injunction and damages suffered by Appellees. Appellant's argument in this regard is not well-taken.

**CIVIL CONTEMPT SANCTIONS**

**{57}**     Appellant's final substantive arguments relate to the district court's award of civil contempt sanctions. Appellant first argues that substantial evidence did not support this award. As noted above, in reviewing whether substantial evidence exists to support a district court's ruling, we defer to the factual findings of the district court but review the application of those facts to the law de novo. *Benavidez*, 2006-NMCA-138, ¶ 21. Additionally, our appellate courts view the evidence and draw all reasonable inferences in the light most favorable to the findings of the district court. *Cave v. Cave*, 1970-NMSC-113, ¶ 4, 81 N.M. 797, 474 P.2d 480. Second, Appellant argues that compensatory sanctions were not an appropriate remedy because neither party prevailed in the underlying litigation. This Court reviews a district court's determination that a party prevailed at trial for an abuse of discretion. *Mayeux v. Winder*, 2006-NMCA-028, ¶ 41, 139 N.M. 235, 131 P.3d 85. We address Appellant's arguments in turn.

**{58}**     "The elements necessary for a finding of civil contempt are: (1) knowledge of the

court's order, and (2) an ability to comply." *In re Hooker*, 1980-NMSC-109, ¶ 4, 94 N.M. 798, 617 P.2d 1313. Although periodically discussed in our appellate opinions, neither willfulness nor intent is an element of civil contempt. *Spear v. McDermott*, 1996-NMCA-048, ¶ 41, 121 N.M. 609, 916 P.2d 228. As such, Appellant's argument that the district court's characterization of Appellant's conduct as a "willful decision" requires that we consider "willfulness" as an element of civil contempt is misplaced.

**{59}** Appellant does not contest that it had knowledge of the Permanent Injunction. Appellant does, however, argue that "[t]here was no evidence presented to the district court to suggest that . . . [Appellant] ever had the ability to comply with the [Permanent Injunction.]" In support of this argument, Appellant states, without citation to the record, that "[a]ll the evidence presented to [the] district court . . . demonstrated that although [Appellant] was attempting to comply with the [Permanent Injunction], continuing issues regarding the availability of manpower and equipment, coupled with weather, delayed compliance." *See* Rule 12-213(A)(4) (requiring the appellant to provide citations to the record proper in support of each argument).

**{60}** This argument, which advances Appellant's theory that it was unable to comply with the Permanent Injunction, improperly shifts the burden of proof from Appellant to Appellees. *See Spear*, 1996-NMCA-048, ¶ 31 ("[T]he contemnor has the burden of proof concerning inability to comply with a court order. . . . [T]his burden extends to the self-inducement issue; that is, the contemnor has the burden of proving not only that it [was] impossible for him to comply, but that he did not create the impossibility." (citation omitted)). Whatever the evidence was at trial, it clearly did not impress upon the district court that circumstances related to weather and resource allocation created a situation in which Appellant was unable to comply. Additionally, Appellant did not request that the district court make such a finding in its proposed findings of fact and conclusions of law. The district court expressly concluded that "[Appellant's] decision not to allocate sufficient resources . . . and [its] decision to not continuously prosecute the maintenance . . . was a deliberate, conscious decision[.]" This factual finding indicates that neither weather nor a lack of available resources created a situation in which Appellant was unable to comply with the Permanent Injunction. We defer to the factual findings of the district court.

**{61}** Appellant had the burden of proving that it was unable to comply with the Permanent Injunction. Its attempt to shift that burden of proof to Appellees, necessitating that Appellees prove that Appellant was able to comply, is misplaced and constitutes a mischaracterization of our civil contempt jurisprudence.

**{62}** Appellant's "prevailing party" argument correctly articulates our general rule that "compensatory sanctions [are] only available if petitioner wins the action in the original [law]suit." *Rhinehart v. Nowlin*, 1990-NMCA-136, ¶ 28, 111 N.M. 319, 805 P.2d 88. However, its claim that the parties' entry into the Settlement Agreement and voluntary dismissal of the underlying case resulted in a circumstance in which neither party "won" in the underlying case is not compelling.

18

**{63}** The prevailing party in litigation is "[t]he party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not necessarily to the extent of his original contention." *Mayeux*, 2006-NMCA-028, ¶ 41 (internal quotation marks and citation omitted). As discussed above, the district court entered an enforceable judgment, in the form of the Permanent Injunction, on January 18, 2013. The Permanent Injunction imposed mandatory maintenance obligations on Appellant, as requested in the initial complaint and granted in the district court's preliminary injunction. The entry of the Permanent Injunction was "the main issue" in the underlying lawsuit. *Id.* Because Appellees' claims arose from a violation of the Permanent Injunction, the district court did not abuse its discretion in concluding that compensatory sanctions were an appropriate remedy for contempt.

## CALCULATION OF DAMAGES

**{64}** Finally, Appellant claims that the district court erred in its calculation of damages. The district court ruled that Appellees were entitled to recover actual losses in the amount of $408,764. Appellant argues on appeal that the appropriate method to calculate damages to real property "is the difference between the value of the property immediately before the occurrence and immediately after." *See* UJI 13-1819 NMRA ("You shall determine what was the value of the property immediately before the occurrence and immediately after the occurrence. The difference between these two figures is the legal measure of damages to real property."). We believe that Appellant's argument is largely misplaced.

**{65}** As a general rule, the remedy for civil contempt is "[j]udicial sanctions . . . to compensate the complainant for losses sustained." *State ex rel. Apodaca v. Our Chapel of Memories of N.M., Inc.*, 1964-NMSC-068, ¶ 10, 74 N.M. 201, 392 P.2d 347. The losses sustained by Appellees, as indicated by the district court's findings of fact and conclusions of law, were to personal property and improvements, including crops, livestock, irrigation systems, flood control structures, and fences. *See Branch v. Walker*, 1952-NMSC-080, ¶ 7, 56 N.M. 594, 247 P.2d 172 (describing "farming implements, livestock and . . . crops" as personal property). The appropriate method for calculating damages to personal property is the cost of repair. *See* UJI 13-1813 NMRA ("In determining [personal] property damages, if any, you may award the reasonable expense of necessary repairs to the property which was damaged.").[2]

**{66}** However, the district court also awarded compensatory sanctions in the amount of $15,000 for work performed by Appellees prior to September 14, 2013. Work performed by Appellees prior to the date on which they suffered damages cannot be included as part of

---

[2]UJI 13-1817 NMRA articulates an alternative method for calculating damages to personal property. However, neither party offered any testimony or evidence as to the diminution of value to Appellees' personal property. Therefore, we utilize UJI 13-1813 in our analysis.

"the reasonable expense of necessary repairs to the property which was damaged." *Id.* While Appellees may be entitled to reimbursement or payment for this work, they must attempt such recovery under an alternate legal theory.

{67} Appellees suffered damages to personal property in the amount of $393,764. As such, we affirm this portion of the award in Appellees' favor. We reverse the district court's award of $15,000 for work performed by Appellees prior to September 14, 2013. To the extent that Appellant offered additional arguments related to statutory limitations on damages in its docketing statement, these arguments are not developed on appeal and are not considered by this Court. *See State v. White*, 1994-NMCA-084, ¶ 1, 118 N.M. 225, 880 P.2d 322 ("Issues raised at earlier stages of the appeal but not briefed are deemed abandoned.").

**ATTORNEY FEES AND COSTS**

{68} Appellant filed a separate notice of appeal related to the district court's order denying its objection to Appellees' attorney fees affidavit and cost bill. Appellant filed a docketing statement addressing these issues. The background section of Appellant's brief in chief includes discussion of the district court's award of attorney fees and costs. This section generally asserts Appellant's claims that the district court erred by (1) awarding costs designated as non-recoverable by Rule 1-054(D)(3) NMRA, (2) awarding attorney fees for clerical work, and (3) failing to reduce expert witness fees. However, neither the brief in chief nor the reply brief offers any legal argument on these topics. Given the filing of a separate notice of appeal and docketing statement, and discussion in the background section of the brief in chief, we are unclear whether this omission was intentional or inadvertent. Regardless, Appellant has abandoned these issues on appeal. *See White*, 1994-NMCA-084, ¶ 1.

**CONCLUSION**

{69} For the foregoing reasons, we affirm in part but reduce the award of civil contempt damages in favor of Appellees to $393,764.

{70} **IT IS SO ORDERED.**

_____
**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Chief Judge**

_____
**JONATHAN B. SUTIN, Judge**