The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: July 22, 2022

**No. A-1-CA-37810**

**WILD HORSE OBSERVERS ASSOCIATION, INC.,**

Plaintiff-Appellee,

v.

**NEW MEXICO LIVESTOCK BOARD,**

Defendant-Appellant,

and

**SHELLEY MCALISTER, NATHAN LIPPERT, and TEEATTA LIPPERT,**

Defendants by Intervention.

**APPEAL FROM THE DISTRICT COURT OF LINCOLN COUNTY**
**Daniel A. Bryant, District Judge**

Steven K. Sanders & Associates, LLC
Steven K. Sanders
Albuquerque, NM

for Appellee

Hector H. Balderas, Attorney General
Olga Serafimova, Assistant Attorney General
Santa Fe, NM

for Appellant

Falen Law Offices, LLC
Brandon L. Jensen
Cheyenne, WY

for Amici Curiae New Mexico Cattle Growers' Association and New Mexico Farm and Livestock Bureau

Reynolds Law Office
David G. Reynolds
Placitas, NM

for Amici Curiae Caroline McCoy, Clint Skeen, Michael S. Neas, Susan Blumenthal, Carolyn Kennedy, and Lynn Montgomery

**OPINION**

**HANISEE, Chief Judge.**

{1}     In this appeal, we again examine the protection afforded to New Mexico's free-roaming horses under NMSA 1978, Section 77-18-5 (2007). We first did so seven years ago, when we concluded in *Wild Horse Observers Association, Inc. v. New Mexico Livestock Board*, (*Wild Horse I*) that certain undomesticated, unowned, free-roaming horses could not be characterized as "livestock" or "estray" rather than as "wild horses." 2016-NMCA-001, ¶ 16, 363 P.3d 1222. In the case at hand, the New Mexico Livestock Board (the Board) appeals from a district court order granting declaratory and injunctive relief sought by Wild Horse Observers Association, Inc. (WHOA) under the New Mexico Declaratory Judgment Act, NMSA 1978, §§ 44-6-1 to -15 (1975), and the Livestock Code, NMSA 1978, §§ 77-2-1 to -18-6 (1869, as amended through 2015). As was the case in *Wild Horse I*, the Board wishes to classify certain horses—this time corralled by a private citizen onto private property—as estray livestock, rather than as wild horses. We agree with the district court that the Board may not do so; however, we reverse the district court's determination that when the Board unlawfully captures horses on private land, the testing requirements of Section 77-18-5(B) apply, potentially triggering the unjustified removal of wild horses from their natural habitat. *See id.* (providing that a wild horse "captured on public land shall have its conformation, history and

deoxyribonucleic acid tested [DNA]"). We remand for further proceedings consistent with this opinion and for additional consideration of attorney fees.

**BACKGROUND**

{2}    In 2016, private land lessor Carolyn McCoy contacted the Board complaining about a herd of free-roaming horses near her property in Alto, an unincorporated community in Lincoln County, New Mexico. The Board informed McCoy that it was only permitted to take possession of horses that are corralled or captured by a private citizen. Afterward, McCoy corralled twelve horses—seven mares and five foals (the subject horses)—and contacted the Board again.[1] In August 2016, the

---

[1]The parties dispute whether McCoy lured the horses onto her property. The district court determined that the subject horses "had been enticed or 'lured' into a corral" by "Carolyn McCoy to have them adopted out or sold." The Board now asserts that "[a]t no point did . . . McCoy lure the horses onto her property, which is entirely surrounded by other private property." While McCoy testified to that effect, WHOA presented evidence to the contrary, including Facebook posts from McCoy stating her intent to lure the subject horses. "We will not reweigh the evidence nor substitute our judgment for that of the fact[-]finder." *Clark v. Clark*, 2014-NMCA-030, ¶ 26, 320 P.3d 991 (alteration, internal quotation marks, and citation omitted); *see also Skeen v. Boyles*, 2009-NMCA-080, ¶ 37, 146 N.M. 627, 213 P.3d 531 (stating that when the district court hears conflicting evidence, "we defer to its determinations of ultimate fact, given that we lack opportunity to observe demeanor, and we cannot weigh the credibility of live witnesses"). In any event, the Board identifies no evidence on appeal that contradicts the district court's finding that McCoy lured or enticed the subject horses. *See Chan v. Montoya*, 2011-NMCA-072, ¶ 9, 150 N.M. 44, 256 P.3d 987 ("It is not our practice to rely on assertions of counsel unaccompanied by support in the record. The mere assertions and arguments of counsel are not evidence." (internal quotation marks and citation omitted)). Lastly,

Board took possession of the subject horses, transported them to Santa Fe, and informed Lincoln County residents that the horses would ultimately be returned to Lincoln County, which incorporates Alto, in the following weeks. Such was inconsistent, however, with that which the Board posted on its website, namely that the subject horses would be sold at auction.

{3} WHOA filed a complaint for declaratory relief and emergency injunctive relief on August 29, 2016, asserting that the Board exceeded its authority and unlawfully treated the subject horses as estray livestock. A month later, WHOA filed a petition for declaratory relief seeking an order declaring the subject horses to be wild horses, as well as a temporary restraining order (TRO) preventing the Board from impounding or selling the subject horses. The district court granted WHOA's request for a TRO, thereby prohibiting the Board from "taking any action to sell, dispose, move away, separate or dissipate" the subject horses "during the pendency of this cause." The TRO expressly permitted the Board to "work[] with [WHOA], or any member of the public in Lincoln County who is willing to provide real estate, stables, pens, food and services for the care and preservation of [the subject] horses during the pendency of this cause of action." The district court denied the Board's request that WHOA be required to post a bond upon entry of the TRO.

the manner in which the subject horses came to be corralled on private property does not affect the resolution of the issues on appeal.

{4}	Subsequently, nine individual residents of Lincoln County—some of whom became intervening parties to the proceeding—executed certificates agreeing to provide shelter, food, and health care for the subject horses together at a designated location in Alto, during the pendency of this action. WHOA moved to extend the TRO in December 5, 2016, which the district court did. The TRO was modified in February 2017 to allow two of the subject horses to be adopted for medical reasons. One year later, the district court again modified the TRO allowing the intervening parties who were caring for the subject horses to be removed from any obligations agreed upon under the certificates they signed. The district court further ordered that WHOA and the Board share the expenses of caring for the subject horses until a trial on the merits, and required the parties to determine a new location for the subject horses to reside. Pursuant to that order, the subject horses were transferred to a fenced property within Lincoln County, near Carrizozo, New Mexico.

{5}	The district court presided over a four-day bench trial in May 2018. Afterward, the court issued its findings of fact and conclusions of law, determining that the Board's actions to take possession and sell the subject horses are contrary to the Board's statutory authority. The district court additionally concluded that the Board failed to comply with its statutory duties under Section 77-18-5(B), enjoined the Board from "further unlawful possession and selling" of the subject horses, and awarded WHOA costs and attorney fees. The Board appeals.

**DISCUSSION**

{6}     On appeal, the Board asserts that because the subject horses were captured on private, rather than public land, the district court erred in concluding them to be "wild horses" under Section 77-18-5(A)(4) and in concluding that the Board must adhere to Section 77-18-5(B). The Board also contends that the district court made findings of fact that are unsupported by substantial evidence, issued a vague injunction, erred in awarding attorney fees, and erred in refusing to impose an injunction bond upon WHOA.[2]

---

[2]The Board additionally asserts that the district court erred in denying the Board's motion to dismiss for lack of standing and relatedly challenges WHOA's authority to file the underlying litigation. We determine these contentions as raised by the Board to be without merit, and we decline to further address them on appeal. We remind the Board that litigants are encouraged to limit the number of issues they choose to raise on appeal to ensure that those presented are adequately supported by argument, authority, and properly cited facts in the record. *See Rio Grande Kennel Club v. City of Albuquerque*, 2008-NMCA-093, ¶¶ 54-55, 144 N.M. 636, 190 P.3d 1131 ("[W]e encourage litigants to consider carefully whether the number of issues they intend to appeal will negatively impact the efficacy with which each of those issues can be presented."); *see also Baker v. Endeavor Servs., Inc.*, 2018-NMSC-035, ¶ 2, 428 P.3d 265 ("Unless findings are directly attacked, they are the facts in this court, and a party claiming error on the part of the trial court must be able to point clearly to the alleged error.").

**I.    The District Court Did Not Err in Concluding That the Subject Horses Are Wild Horses Under Section 77-18-5(A)(4), but Erred in Concluding That When the Board Wrongfully Took Possession of the Subject Horses on Private Land, the Board Should Have Conformed to its Duties Under Section 77-18-5(B)**

{7}    The primary issue on appeal relates to the Board's authority and responsibilities as to the subject horses after they were corralled on McCoy's private property. The Board argues that the district court erred by concluding that the subject horses are "wild horses," as that term is defined in Section 77-18-15(A)(4), because they were not "captured on public land," which is a phrase that appears in a different subsection of the statute, Section 77-18-15(B), and because the Legislature clearly intended to distinguish between public land and private land in the Livestock Code in general. WHOA answers that although the subject horses were captured by a private citizen on private land, the district court did not err in determining that the subject horses are wild horses and not estray, and therefore, may not be treated as estray, because Section 77-18-5 "was enacted to preserve and maintain New Mexico['s] public ranges for wild horses, generally, and also to protect Spanish colonial horses, specifically."

{8}    We review the district court's order and injunction for abuse of discretion. *See Rapid Temps, Inc. v. Lamon*, 2008-NMCA-122, ¶ 13, 144 N.M. 804, 192 P.3d 799 ("Generally, a complaint seeking injunctive relief is directed to the sound discretion of the trial court. However, the trial court abuses [its] discretion when it applies an

6

incorrect standard, incorrect substantive law, or its discretionary decision is premised on a misapprehension of the law." (alteration, internal quotation marks, and citations omitted)). However, we review the district court's application of Section 77-18-5 to the subject horses—whose habitat generally includes public land but who were corralled on private property—de novo. *See Little v. Jacobs*, 2014-NMCA-105, ¶ 7, 336 P.3d 398 ("Statutory interpretation is an issue of law that we review de novo." (internal quotation marks and citation omitted)). "When construing statutes our charge is to determine and give effect to the Legislature's intent." *Id.* (internal quotation marks and citation omitted). To discern that "appellate courts look first to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *Wild Horse I*, 2016-NMCA-001, ¶ 11 (alteration, internal quotation marks, and citations omitted). "[W]hen a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 37, 147 N.M. 583, 227 P.3d 73 (internal quotation marks and citation omitted). "The statute or statutes, whose construction is in question, are to be read in connection with other statutes concerning the same subject matter." *State ex rel. Child., Youth & Fams. Dep't v. Djamila B.*, 2014-NMCA-045, ¶ 10, 322 P.3d 444 (alteration, internal quotation marks, and citation omitted).

## A. The Legal Framework Regarding New Mexico's Wild Horses

{9}     Before turning to the district court's application of Section 77-18-5, we briefly set forth the relevant legal background. New Mexico's wild horses are governed by federal law and certain New Mexico statutes and administrative code provisions. In enacting the Wild Free-Roaming Horses and Burros Act (WHBA), 16 U.S.C. §§ 1331-1340, Congress declared in 1971 that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West" and "shall be protected from capture, branding, harassment, or death." § 1331. The WHBA defines "wild free-roaming horses and burros" as "all unbranded and unclaimed horses and burros on public lands of the United States." § 1332(b). "[P]ublic lands" are defined as "any lands administered by the Secretary of the Interior through the Bureau of Land Management or by the Secretary of Agriculture through the Forest Service." § 1332(e). Importantly, the WHBA also extends protection to such animals that stray from public land onto private land. § 1334; *Kleppe v. New Mexico*, 426 U.S. 529, 546 (1976).

{10}     Our Legislature has also enacted statutes designed to protect wild horses. Section 77-18-5(A)(4) defines "wild horse" as "an unclaimed horse on public land that is not an estray." Section 77-18-5(A)(1) defines "public land" as "not includ[ing] federal land controlled by the bureau of land management, the forest service or state trust land controlled by the state land office." Read in connection

8

with one another, the federal statute governs wild horses on the federally managed lands described in § 1332(e), and the state statute governs wild horses on all other public lands except state trust land that is controlled by the state land office.

{11} Section 77-18-5 also explains the Board's role in protecting New Mexico's wild horses. *See Wild Horse I*, 2016-NMCA-001, ¶ 22 ("We conclude that the Legislature intended to require the Board to test and relocate horses captured on public land as provided under Section 77-18-5(B)."). Section 77-18-5(B) provides:

> A wild horse that is captured on public land shall have its conformation, history and [DNA] tested to determine if it is a Spanish colonial horse. If it is a Spanish colonial horse, the wild horse shall be relocated to a state or private wild horse preserve created and maintained for the purpose of protecting Spanish colonial horses. If it is not a Spanish colonial horse, it shall be returned to the public land, relocated to a public or private wild horse preserve or put up for adoption by the agency on whose land the wild horse was captured.

{12} Section 77-18-5(C) also emphasizes the "necess[ity of] preserving the genetic stock of the herd and for preserving and maintaining the range" and authorizes the mammal division at the University of New Mexico to control the wild horse population through the use of contraceptives. If this division determines that "a wild horse herd exceeds the number of horses that is necessary for preserving the genetic stock of the herd and for preserving and maintaining the range," the division "may cause excess horses" to be:

> (1) humanely captured and relocated to other public land or to a public or private wild horse preserve;

        (2)    adopted by a qualified person for private maintenance; or

        (3)    euthanized; provided that this option applies only to wild horses that are determined by a veterinarian to be crippled or otherwise unhealthy.

*Id.*

{13}    Our analysis of the questions at hand is also guided by relevant precedent examining the role of the Board. The United States Supreme Court considered the role of New Mexico's Livestock Board in *Kleppe*, following a challenge by the Board in which a federal district court determined that the WHBA was unconstitutional. *See State v. Morton*, 406 F. Supp. 1237 (D.N.M. 1975), *rev'd by Kleppe*, 426 U.S. at 534-35. In *Kleppe*, the Supreme Court reversed the district court holding that the WHBA was a constitutional exercise of Congressional power under the Property Clause and prohibited the Board from removing wild burros on federal public lands. 426 U.S. at 546.

{14}    As previously stated, this Court has also considered the limitations of the Board. *See generally Wild Horse I*, 2016-NMCA-001, ¶ 1. In *Wild Horse I*, we held that the Board "unlawfully treated a group of undomesticated, unowned, free-roaming horses . . . as 'livestock' and 'estray' rather than as 'wild horses.'"[3] *Id.*

---

[3]Our holding in *Wild Horse I* is also consistent with the opinion of the New Mexico Attorney General, who has explained that "the wild horses do not fit within the applicable definition of 'livestock' . . . and, therefore, the . . . Board does not have the statutory authority to take possession of and sell them as estrays." N.M. Att'y Gen., No. 94-06 (Aug. 25, 1994).

10

¶¶ 1, 9. We further concluded that the Livestock Code requires "a determination about whether a horse is domesticated or wild" and "the Legislature intended to require the Board to test and relocate horses captured on public land as provided under Section 77-18-5(B)." *Wild Horse I*, 2016-NMCA-001, ¶¶ 18, 22. We further explained that because "estray" is defined under the Livestock Code as "livestock found running at large upon public or private lands, either fenced or unfenced," § 77-2-1.1(N), and "wild horse" is defined as "an unclaimed horse on public land that is not an estray," § 77-18-5(A)(4), the statutory definition of "estray" does not encompass New Mexico's wild horses. *See Wild Horse I*, 2016-NMCA-001, ¶ 27. With this legal framework in mind, we now address the issues before us.

**B.      Because the Habitat of the Subject Horses Includes New Mexico's Public Land, the Subject Horses Meet the Statutory Definition of Wild Horses and Therefore May Not Be Treated as Estray by the Board**

{15}      To determine whether the subject horses are "wild horses," we revisit the Legislature's definition of that phrase in Section 77-18-5(A)(4): "an unclaimed horse on public land that is not an estray." The district court made unchallenged findings that before the herd of horses that included the subject horses were captured, they roamed various public lands, including but not limited to the property owned by the Village of Ruidoso, property owned by the City of Alamogordo, as well as state and county roads and rights of way. The district court additionally determined that the subject horses "do not and never have had owners, were not born or raised or used

11

on a ranch or farm" and have been seen "free-roaming the Alto, New Mexico area" for over thirty years. Because the Board does not challenge these factual findings on appeal, the question before us is whether they suffice to support the district court's determination that the subject horses are not "estray" and separately resolve the inquiry as to whether they were "on public land."[4] Section 77-18-5(A)(4). We answer each question affirmatively, disagreeing with the district court as to the latter answer.

{16}    In determining whether the subject horses are estray, we first consider whether the wild horses are "livestock found running at large upon public or private lands, either fenced or unfenced." Section 77-2-1.1(N). *Wild Horse I* makes clear the Board is prohibited from treating undomesticated wild animals as estray. *See* 2016-NMCA-001, ¶¶ 17-18. *Wild Horse I* further instructs that the Board may not treat a "group of undomesticated, unowned, free-roaming horses" as estray livestock rather than as wild horses. *Id.* ¶ 1. Like the group of horses at issue in *Wild Horse I*, here the subject

---

[4]The Board argues that the district court erred in concluding that "public land" as contemplated by Section 77-18-5(A)(1) encompasses all land other than federal public land. We agree and conclude that district court erred in incorporating land that is privately owned in its definition of nonfederal public land. But this mistake of law does not require reversal as to the district court's central determination that the Board acted unlawfully regarding the subject horses. The unchallenged findings of the district court establish that the subject horses were on "public land" at various points in time, and as we hold today, the fact that they were on private land at the moment of capture, does not mean the subject horses were then estray. It follows that the Board was not authorized to treat the horses as estray, and the district court correctly enjoined them from doing so.

12

horses are not and were never domesticated. As the district court explained, the Board has no record of ownership of the subject horses nor have they "been used or raised as domestic work animals . . . or used or raised as livestock on a farm or a ranch." *See id.* ¶ 15 (interpreting the "definition of 'livestock' to include only domestic or domesticated animals" and rejecting "the argument that all horses anywhere in New Mexico are livestock because horses are included within the definition of livestock"). Therefore, we agree with the district court that the subject horses are indeed "wild horses" under Section 77-18-5(A)(4) and are not "estray."

{17}    Given that determination, we now consider whether the subject horses were on "public land" as contemplated by Section 77-18-5(B). The absence of the word "capture" from the phrase "on public land" in the definition of "wild horse" in Section 77-18-5(A)(4) casts serious doubt on the Board's argument that the location where horses happen to be captured dictates whether they qualify as wild horses, and that the horses at issue in this appeal do not qualify merely because they were captured on private land. Had the Legislature intended to make the definition turn on the nature of the land where horses are captured, it easily could have done so by using the phrase "captured on"—which the Legislature included in Section 77-18-5(B) but, critically, omitted from Section 77-18-5(A)(4).[5] *See Schultz ex rel. Schultz*

---

[5] Like the statutory definition, the definition in the New Mexico Administrative Code does not state or in any way suggest that whether a horse is a wild horse depends on where it is captured. *See* 21.30.5.7(F) NMAC (defining

*v. Pojoaque Tribal Police Dep't*, 2013-NMSC-013, ¶ 36, 484 P.3d 954 (explaining that "when the Legislature includes a particular word in one portion of a statute and omits it from another portion of that statute, such omission is presumed to be intentional" (internal quotation marks and citation omitted)). Rather than adding the word "captured" to Section 77-18-5(A)(4), *see State v. Greenwood*, 2012-NMCA-017, ¶ 38, 271 P.3d 753 ("The Legislature knows how to include language in a statute if it so desires." (alteration, internal quotation marks, and citation omitted)), we conclude that the phrase "on public land" means that the wild horses' *habitat* includes public land, regardless of where such horses are found at any given point in time.

{18}     Our interpretation in this regard is consistent with the federal definition, which is based on identical statutory language. *See* § 1332(b) (defining "wild free-roaming horses and burros" as "all unbranded and unclaimed horses and burros on public lands of the United States"); *see also* 43 C.F.R. § 4700.0-5(l) (2022) (defining "wild horses and burros" to include "all unbranded and unclaimed horses and burros that use public lands as all *or part of* their habitat" (emphasis added)). For us to allow the Board to take possession of wild horses captured on a privately owned location mere feet from the public land included within the horses' habitat would allow the

---

"[w]ild horses" as "feral horses," and stating that "[f]eral horses are existing in an untamed state having returned to a wild state from domestication").

14

Board to treat such horses as estray, and would eviscerate the purpose of the statute in a way that would be not only nonsensical, but potentially harmful to the animals protected by the statute and other important federal, state, and regulatory enactments. *See* § 1331; § 77-18-5(C). Further, such an interpretation would effectively place a burden on wild horses to somehow avoid private lands in order to maintain their wild status. *See Bishop v. Evangelical Good Samaritan Soc'y*, 2009-NMSC-036, ¶ 11, 146 N.M. 473, 212 P.3d 361 ("We must also consider the practical implications and the legislative purpose of a statute, and when the literal meaning of a statute would be absurd, unreasonable, or otherwise inappropriate in application, we go beyond the mere text of the statute.").

{19} Moreover, Section 77-16-1, which provides "[e]very gardener, farmer, planter or other person having lands or crops that would be injured by trespassing animals, shall make a sufficient fence about his land," places the onus on landowners who wish to keep out wild animals to build a fence sufficient to accomplish that aim. Thus, in the case at hand, the duty was not on the subject horses to avoid entering McCoy's private property. Rather, under Section 77-16-1, if McCoy does not want the subject horses to trespass on her property, she "shall make a sufficient fence," which is not intended to be used to corral the subject horses on private property, but instead to keep them from it. Because it is a landowner's duty to build a fence sufficient to prevent wild horses from entry onto his or her private property, we

15

cannot conclude that a wild horse loses its "wild" status, and thus becomes estray, when it steps over an unenclosed private property boundary, and sets hoof on private land.

{20} We, therefore, conclude that the district court committed no reversible error in finding that the subject horses should be protected as "wild horses" because the definition of that term does not depend on whether, at the moment of their capture, the horses happened to be on land that is private, but instead depends on whether the horses generally roam public land.

**C.    Because the Subject Horses Are Wild Horses, the District Court Erred in Concluding That When the Board Captured the Subject Horses on McCoy's Private Land, It Should Have Conducted its Statutory Duties Under Section 77-18-5**

{21} Because we hold that the subject horses are indeed wild horses under Section 77-18-5(A)(4) and, therefore, may not be treated as estray, we now consider whether the district court erred in finding that the Board "failed to follow statutory procedures for handling wild horses" including failing to test the conformation, history, and DNA of the subject horses.

{22} In analyzing the plain meaning of Section 77-18-5, we conclude that the Legislature did not intend to mean that the Board has a duty to test the conformation, history, and DNA of a wild horse if it is captured on *private land*. Such would be contrary to the otherwise exacting requirements of the statute. *See Britton v. Off. of Att'y Gen.*, 2019-NMCA-002, ¶¶ 27-28, 433 P.3d 320 ("A construction must be

16

given which will not render the statute's application absurd or unreasonable and which will not defeat the object of the Legislature. . . . We should not attribute to the Legislature an undue precision in drafting and thereby frustrate legislative intent when we construe a statute." (alteration, internal quotation marks, and citations omitted)). In our view, the directive set forth in Section 77-18-5(B), alongside our Court's interpretation of this section in *Wild Horse I*, is clear and unambiguous—the Board's duty to test the conformation, history, and DNA of a wild horse is only applicable where a wild horse "is captured on public land." *See BOKF v. Unknown Heirs of Pacheco*, 2021-NMCA-010, ¶ 17, 484 P.3d 1020 ("We may only add words to a statute where it is necessary to make the statute conform to the Legislature's clear intent, or to prevent the statute from being absurd." (alteration, internal quotation marks, and citation omitted)). Because this statutory directive does not contemplate a scenario where a wild horse is captured on private land, we deem it to be inapplicable to the facts at hand. Therefore, we hold that the Board is only required to test the conformation, history, and DNA of wild horses captured on *public land*, *see* § 77-18-5(B), and to the extent the district court found otherwise, it committed reversible error.

{23}     This interpretation of Section 77-18-5(B) is supported by both federal and state law. 16 U.S.C. § 1334 demonstrates that wild free-roaming horses maintain

17

their wild status when they stray from public lands. 16 U.S.C. § 1334 provides in part:

> If wild free-roaming horses . . . stray from public lands onto privately owned land, the owners of such land may inform the nearest Federal marshall or agent of the Secretary [of the Interior], who shall arrange to have the animals removed. In no event shall such wild free-roaming horses . . . be destroyed except by the agents of the Secretary.

Read in connection with Section 77-18-5(C)—which authorizes a wild horse's removal from public lands in only justified and limited circumstances, such as population control—it is clear that the goal of both Congress and our Legislature is to leave wild horses in their natural habitat unless there is a valid reason to remove them. When there is such a valid reason, the requirements of Section 77-18-5(B) are triggered.

{24} Therefore, to remove the word "public" from Section 77-18-5(B), and categorically require the Board to conduct conformation, history, and DNA testing of all wild horses it captures—even those captured on private land without legal justification—would allow the Board to remove wild horses with Spanish colonial ancestry from their natural habitat. Thus, private landowners such as McCoy, would achieve through violation of Section 77-18-5(B), exactly the result desired: removal of wild horses that such landowners deem to be a nuisance.

{25} For these reasons, we hold that the district court did not err in determining that the subject horses are wild horses under Section 77-18-5(A)(4) and that that the

18

Board therefore, ran afoul of the Livestock Code by treating the subject horses as estrays. However, we hold that the district court erred in determining that the Board failed to follow its statutory duties under Section 77-18-5(B). Rather, in our view, when the Board is asked to address wild horses captured on *private* land, it has no authority to test the conformation, history, and DNA of such horses, any more than it does to take possession of and remove the wild horses from their public habitat in circumstances that do not otherwise justify such action. Rather, in such circumstances as the Board here faced, its duty was to return the subject horses to the public land they inhabit.

**II. Certain District Court Findings That the Board Argues Are Unsupported by Substantial Evidence Are Not Determinative to Our Holding**

{26} The Board contends that many of the district court's findings are unsupported by substantial evidence. WHOA answers that not only do the Board's arguments related to substantial evidence fail to comply with the New Mexico Rules of Appellate Procedure, but the findings the Board "addresses are not necessary to the judgment." We agree with WHOA's latter argument and explain.

**A. Findings Related to Caroline McCoy as an Agent of the Board**

{27} The Board argues that "the district court incorrectly concluded that . . . McCoy, the private landowner who impounded the horses, acted as an 'agent' of the

19

Board." Specifically, the Board argues that no evidence was presented to support an agency relationship.

{28} Even if we were to conclude that substantial evidence did not support the district court's conclusion that McCoy was acting as an agent of the Board, such status or the lack thereof has no impact on our holding today. In our view, it is irrelevant whether the Board itself or an agent of the Board initially took possession of the subject horses on private land. Rather, as we explained above, regardless of how the Board came into possession of the horses, they are wild horses, and therefore, the Board was not authorized to treat them as estrays.

**B.      Findings as Related to the Subject Horses**

{29} The Board additionally argues that the district court's determinations that the wild horses of Alto—including the subject horses—"have lived on *all* unfenced lands around Alto, that the horses have lived in the area since 1965, and that all horses are wildlife," were not supported by substantial evidence. The Board fails to provide any context to the district court's statements and misstates the district court's findings of fact.

{30} As an initial matter, the Board fails to meet its burden on appeal regarding this contention because it neglects to explain the pertinence of the evidence that it seeks to attack or adequately point to evidence contrary to that which formed the basis of the district court's findings. *See* Rule 12-318(A)(3) NMRA ("A contention that a

20

verdict, judgment, or finding of fact is not supported by substantial evidence shall be deemed waived unless the summary of proceedings includes the substance of the evidence bearing on the proposition."); *see also*, *Chavez v. S.E.D. Lab'ys*, 2000-NMCA-034, ¶ 26, 128 N.M. 768, 999 P.2d 412 ("[W]e review substantial evidence claims *only if* the appellant apprises the Court of all evidence bearing upon the issue, [including] both [evidence] that . . . is favorable and [evidence] that . . . is contrary to [the] appellant's position." (emphasis added)), *aff'd in part, rev'd in part, and remanded* 2000-NMSC-034, 129 N.M. 794, 14 P.3d 532. Even were we to agree with the Board that the district court's finding of fact that the "wild horses of Alto [including the subject horses] . . . have roamed and occupied *all* unfenced lands of Alto" is an inaccurate overstatement, we remain unpersuaded that the findings of fact the Board seeks to attack are unsupported by substantial evidence. John Lamay, a witness who testified during the TRO hearing, stated that he had seen the wild horses in the Alto area on public land for decades. Similarly, another witness, Jack Reppin, testified that he had seen the wild horses around Bonito Lake, Ski Run Road, and Monjeau Lookout for ten years. Moreover, we observe no district court finding stating, as claimed by the Board, that "*all* horses are wildlife." *See Chan*, 2011-NMCA-072, ¶ 9 ("It is not our practice to rely on assertions of counsel unaccompanied by support in the record." (internal quotation marks and citation omitted)). Therefore, we remain unpersuaded that any of the district court findings

as presented by the Board are unsupported by substantial evidence, or more to the point here, determinative to any legal point of appeal. We, therefore, decline the Board's invitation to undertake a line item review of findings it cherry picks from the overall body of findings that support the district court's legal conclusions.

**III.    Remaining Issues**

{31}    The Board makes three final arguments related to the district court's order of injunction, failure to implement an injunction bond, and award of attorney fees.

**A.    The District Court's Injunction Was Not Vague or Impracticable**

{32}    The Board asserts because the district court refers to the subject horses throughout the injunction with "different descriptors [that] are never defined or reconciled" and orders the Board to engage in "scientifically meaningless DNA testing" of "an unascertained population of horses in Lincoln County," the injunction was "vague, internally contradictory, and irrational."[6] WHOA answers that the injunction is not vague as it "is directed at the subject horses, because they are the

---

[6]The Board also argues that the district court's order requiring that the subject horses "be set loose in a private residential subdivision whose restrictive covenants prohibit animals other than domestic pets" is unlawful. We note that in making this argument, the Board concedes that it understands precisely which wild horses the district court's injunction contemplates. However, in making this argument the Board fails to adequately explain why this aspect of the district court's order renders it an abuse of discretion, and we, therefore, decline to address it. *See Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701 ("This Court has no duty to review an argument that is not adequately developed."); *see also Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be.").

only Lincoln County wild horses held by the [Board.]" We agree with WHOA's position and explain.

{33}     "The granting of an injunction is an equitable remedy, and whether to grant equitable relief lies within the sound discretion of the trial court." *Insure N.M., LLC v. McGonigle*, 2000-NMCA-018, ¶ 7, 128 N.M. 611, 995 P.2d 1053. Thus, the trial court's discretion will not be disturbed unless there is an abuse of discretion. *Moody v. Stribling*, 1999-NMCA-094, ¶ 30, 127 N.M. 630, 985 P.2d 1210. "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Insure N.M., LLC*, 2000-NMCA-018, ¶ 7 (internal quotation marks and citation omitted). "In determining whether to grant injunctive relief, a district court must consider a number of factors and balance the equities and hardships." *Allred v. N.M. Dep't of Transp.*, 2017-NMCA-019, ¶ 36, 388 P.3d 998 (alteration, internal quotation marks, and citation omitted). "Some of these factors include: (1) the character of the interest to be protected; (2) the relative adequacy to the plaintiff of an injunction, when compared to other remedies; (3) interests of third parties; (4) the practicability of granting and enforcing the order; and (5) the relative hardship likely to result to the defendant if granted and to the plaintiff if denied." *Id.* (internal quotation marks and citation omitted).

{34}    Here, the district court declared, in pertinent part, that

> "the [Board] is enjoined from any further unlawful possession and sale of the Lincoln County wild horses contrary to the Livestock Code" and that "the [Board] does not have jurisdiction over the Lincoln County wild horse herd."

The Board contends that because the district court's order does not "define the population of horses to which the . . . injunctions apply, the Board cannot be reasonably apprised of what conduct will be treated as a violation of the district court's order." It is true that within its order of injunction the district court varyingly referenced the subject horses, as the "subject wild horses that reside on public lands," the "Lincoln County wild horse herd," and the "unclaimed Lincoln County horses," and that such may be considered inconsistent. However, reading the district court's order as a whole, it is apparent that the district court was referring to the members of the wild horse herd of Alto, including the twelve horses, seven mares, and five foals—the subject horses—of which the Board initially took possession. *See Jones v. Schoellkopf*, 2005-NMCA-124, ¶ 8, 138 N.M. 477, 122 P.3d 844 ("[W]e review the evidence in the light most favorable to support the [district] court's findings, resolving all conflicts and indulging all permissible inferences in favor of the decision below."). Nowhere within its order does the district court suggest its ruling applies to all wild horses in Alto or indeed to any wild horse other than the subject horses. Thus, we remain unpersuaded that the differing descriptive nomenclature employed by the district court renders its injunction impracticable to implement. *See*

24

*Allred*, 2017-NMCA-019, ¶ 36 (explaining that in issuing an injunction the district court must consider the practicability of granting and enforcing the order); *see also Wilcox v. Timberon Protective Ass'n*, 1990-NMCA-137, ¶ 45, 806 P.2d 1068 (determining that an injunction requiring the removal of ten mobile homes "does not require either an impossibility or something that is highly impracticable"), *abrogated on other grounds by Agua Fria v. Rowe*, 2011-NMCA-054, ¶ 22, 149 N.M. 812, 255 P.3d 390.

{35} We further recognize that the current and future placement of the subject horses may differ from the locations contemplated by the district court's order. However, such does not require that we overturn the district court's order given our holding reversing the district court's determination that the Board was required to comply with its duties pursuant to Section 77-18-5, including its duty to relocate wild horses the Board determined to be Spanish colonial. We emphasize the district court's authority, on remand, to address evolving factual circumstances and modify its injunction accordingly.

## B. Injunction Bond

{36} The Board additionally contends that the district court "abused its discretion in refusing to impose an injunction bond" and in denying the Board's motion to dissolve the TRO. Specifically, the Board asserts that the district court failed to

explain its reasoning as to why no bond was required at the relevant hearing or in its written order.

{37} We review the district court's decision to grant or deny injunctive relief under an abuse of discretion. *Nat'l Tr. for Historic Pres. v. City of Albuquerque*, 1994-NMCA-057, ¶ 21, 117 N.M. 590, 874 P.2d 798; *see MAI Basic Four, Inc. v. Basis, Inc.,* 962 F.2d 978, 980 n.3 (10th Cir. 1992) (affirming the district court's refusal to require an injunction bond (quoting *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) ("[A] trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction, if there is an absence of proof showing a likelihood of harm." (internal quotation marks and citation omitted))). "No restraining order, preliminary injunction or appointment of a receiver shall issue or occur except upon the giving of security by the applicant, in such sum as the court deems proper." Rule 1-066(C) NMRA; *see Gaume v. N.M. Interstate Stream Comm'n*, 2019-NMCA-064, ¶¶ 13, 14, 450 P.3d 476 (explaining that injunction bonds provide a remedy for wrongfully enjoined defendants). However, "for good cause shown and to be recited in the order made, the [district] court or judge may waive the furnishing of a security." Rule 1-066(C).

{38} Here, the district court provided its reasoning in a written order explaining that it "decline[d] to order the posting of a bond because the [c]ourt has offered the ability to the [Board] to work with [WHOA] in this case and return the horses to

26

Lincoln County for their safekeeping during the pendency of this action." Because the district court provided a reasonable explanation in a written order as to why it declined to order an injunction bond, as well as in light of our holding that the injunction was not impracticable for the Board to comply with, *see Gaum*, 2019-NMCA-064, ¶ 13, we determine that the district court did not abuse its discretion.

{39}    Turning to the Board's assertion that the district court abused its discretion in "refusing to evaluate the merits of the Board's motion to dissolve the TRO," we remain unpersuaded. Although the Board contends that the district court mischaracterized the Board's motion as a motion for summary judgment and applied an "incorrect standard," the Board fails to explain what standard was applied or how such incorrect application resulted in an abuse of discretion. *See Farmers, Inc. v. Dal Mach. & Fabricating, Inc.*, 1990-NMSC-100, ¶ 8, 111 N.M. 6, 800 P.2d 1063 ("The presumption upon review favors the correctness of the [district] court's actions. [The a]ppellant must affirmatively demonstrate its assertion of error."). Moreover, our own review of the record demonstrates that the district court heard the merits of the Board's motion, stating that the motion was "styled like a summary judgment motion," and determining the motion to be without merit and therefore declined to order the dissolution of the TRO. Thus, we remain unpersuaded that the district court abused its discretion in this regard.

## C.    Attorney Fees

{40}    The Board finally argues that in awarding WHOA attorney fees in the absence of any statutory provision or any other legal basis for fee-shifting, the district court abused its discretion. WHOA answers that this issue is not ripe because no actual award has been made. Although it appears that a hearing was held in which the district court considered the amount and propriety of attorney fees while this case was pending on appeal, the parties direct us to no final order in the record, nor do they make arguments related to the nature, basis or amount of attorney fees sufficient to address this issue on appeal. *See Kepler v. Slade*, 1995-NMSC-035, ¶ 13, 119 N.M. 802, 896 P.2d 482 ("Matters outside the record present no issue for review." (internal quotation marks and citation omitted)); *see also Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("To rule on an inadequately briefed issue, [an appellate court] would have to develop the arguments itself, effectively performing the parties' work for them."). Because the record and arguments presented by the parties are insufficient to resolve this issue, we decline to further address it and remand to allow the district court to consider and resolve the propriety of an award of attorney fees and to issue an order granting or denying attorney fees.

## CONCLUSION

{41}    We hold that wild horses whose habitat includes public lands do not lose their wild status when captured on private lands. We, therefore, affirm the district court's

order to the extent that it correctly determined that the subject horses are wild horses, and may not be treated as estray, but reverse the district court's determination that the Board should have acted according to its statutory duties under Section 77-18-5, and remand for proceedings consistent with this opinion and further consideration of attorney fees.

{42}    **IT IS SO ORDERED.**


_____
**J. MILES HANISEE, Chief Judge**


**WE CONCUR:**


_____
**ZACHARY A. IVES, Judge**


_____
**SHAMMARA H. HENDERSON, Judge**

29